IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 21-913 T
(Judge Kathryn C. Davis)

CAPSTONE ASSOCIATED SERVICES, LTD.,
by and through CAPSTONE HOLDINGS CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment

**Table of Contents**

I. Introduction. 1

II. Questions presented. 3

III. Statement of the case. 5

A. IRC § 162(a) (2016). 7

B. Treas. Reg. § 1.162-1(a) (2016). 7

IV. Statement of argument. 7

A. Statement of facts. 7

1. Capstone Associated Services Ltd. 8

2. FinServ's operations. 8

3. The insurance contracts. 10

4. The coverage provided by FinServ and FinServ's participation in the PoolRe quota-share risk pool. 13

5. PoolRe's operations. 16

6. Claims Paid by FinServ in 2016. 17

7. Shared-services agreement. 18

8. FinServ audit. 20

9. The Internal Revenue Service's IRC § 6700 examination. 20

B. Summary-judgment standard and related general principles of law. 21

C. The purported tax harm. 23

D. The Federal Circuit's test for the deductibility of premium payments in captive cases. 24

1. The Federal Circuit's decision and analysis in *Ocean Drilling*. 25

2. Risk shifting. 29

3. Risk distribution. 32

E. The insurance contract between Capstone and FinServ is an insurance contract. 33

1. FinServ was a separate corporation from Capstone and was not a sham. 33

2. PoolRe was a separate corporation from Capstone and was not a sham ..... 35

3. The insurance contracts between FinServ, PoolRe, and Capstone transferred Capstone's risk. ..... 36

4. FinServ and PoolRe distributed Capstone's risk. ..... 37

F. Penalties. ..... 39

V. Conclusion. ..... 40

## Table of Authorities

### Cases

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................ 21
*Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,*
731 F.2d 831 (Fed. Cir. 1984)......................................................................... 22
*Cobert v. Miller,* 800 F.3d 1340 (Fed. Cir. 2015) ....................................................... 24
*Ford Motor Company v. United States,* 908 F.3d 805 (Fed. Cir. 2018) ..................... 27
*Frank Lyon Co. v. United States,* 435 U.S. 561 (1978)................................................ 21
*Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205 (1979) ...................... 29
*Harper Group v. Comm'r,* 96 T.C. 45 (T.C. 1991)........................................... 23, 32, 38
*Hart v. Massanari,* 266 F.3d 1155 (9th Cir. 2001) ...................................................... 24
*Helvering v. Le Gierse,* 312 U.S. 531 (1941)................................................... 3, 6, 26, 29
*Humana Inc. v. Comm'r,* 881 F.2d 247 (6th Cir. 1989) ............................................... 32
*Kidde Indus. v. Commissioner,*
40 Fed. Cl. 42 (Fed. Cl. 1997).........................6, 23, 25, 29, 30, 31, 32, 33, 36, 37, 38
*Moline Properties, Inc. v. Commissioner,*
319 U.S. 436 (1943)....................................3, 6, 25, 26, 27, 28, 31, 33, 35, 36, 37, 38
*Monsanto Co. v. Scruggs,* 459 F.3d 1328 (Fed. Cir. 2006) ......................................... 21
*Nat'l Carbide Corp. v. Comm'r,* 336 U.S. 422 (1949).................................................. 27
*Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757 (Fed. Cir. 1988) ................................ 22
*Ocean Drilling & Exploration Co. v. United States,*
988 F.2d 1135 (Fed. Cir. 1993)....6, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 36, 38, 40
*Peterson Mfg. Co. v. Central Purchasing, Inc.,* 740 F.2d 1541 (Fed. Cir. 1984)........ 22
*Premier Office Complex of Parma, LLC v. United States,*
916 F.3d 1006 (Fed. Cir. 2019)....................................................................... 21
*Rent-A-Center Inc. v. Comm'r,* 142 T.C. 1 (2014) ................................................ 26, 33
*Salem Fin., Inc. v. United States,* 786 F.3d 932 (Fed. Cir. 2015) .............................. 21
*Sauer West LLC v. United States,* 157 Fed. Cl. 619 (Fed. Cl. 2022).......................... 24
*Sears, Roebuck & Co. v. Comm'r,* 972 F.2d 858 (7th Cir. 1992) ................................ 30
*Seminole Tribe v. Florida,* 517 U.S. 44 (1996).......................................................... 24
*Structural Rubber Prods. Co. v. Park Rubber Co.,*
749 F.2d 707 (Fed. Cir. 1984)................................................................... 22, 23
*Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.,*
967 F.3d 1339 (Fed. Cir. 2020)....................................................................... 21

*Tex. Am. Oil Corp. v. Dep't of Energy,* 44 F.3d 1557 (Fed. Cir. 1995)........................ 24

**Statutes**

Bipartisan Budget Act (BBA) of 2015 .................................................................... 5
IRC (26 U.S.C.) § 162(a) ............................................................................ 6, 7, 23
IRC § 6226.......................................................................................................... 5, 39
IRC § 6226(f) .......................................................................................................... 39
IRC § 6700............................................................................................................ 20
IRC § 6701............................................................................................................ 20
IRC § 831(a) .......................................................................................................... 20
IRC § 831(b) ..................................................................................................... 20, 35
IRC § 831(b) .......................................................................................................... 10
IRC § 832(b)(1)...................................................................................................... 20
IRC § 832(b)(3)...................................................................................................... 20
IRC § 953(d) ............................................................................................... 10, 17, 20
Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982........................................ 5

**Other Authorities**

Rev. Rul. 2001-31 ............................................................................................ 26, 33

**Rules**

Fed. Cir. R 32.1(a)................................................................................................. 25
RCFC 56(a)............................................................................................................. 21

## I. Introduction.

Insurance premiums are considered ordinary and necessary business expenses that are deductible from a business's income for federal income-tax purposes. This is true even when the insurer is a corporate affiliate of the insured.

At issue is whether insurance premiums paid by Capstone Associated Services Ltd. (Capstone) in 2016 to FinServ Casualty Corporation (FinServ) and PoolRe Insurance Corporation (PoolRe) are deductible for tax year 2016. Capstone and FinServ are corporate siblings. PoolRe is unrelated to both.

Consistent with Supreme Court precedent, the Federal Circuit determined that insurance requires risk transfer by the insured and risk distribution by the insurance company. Additionally, for risk transfer to occur, the insurance company must not be a sham corporation, in which case the insured is merely engaging in self-insurance, which does not yield a tax deduction for the insurance payments.

Risk is transferred under the Federal Circuit analysis when the insured's variability of loss is reduced by the insurance contract. Here, the undisputed facts show that Capstone has never owned stock in FinServ or PoolRe. By entering into the insurance transactions with FinServ and PoolRe, Capstone's reduces its variability of loss. Stated another way, when a covered loss of Capstone's is paid by FinServ or PoolRe, neither Capstone's balance sheet nor its net worth is negatively affected by FinServ's payment of a covered loss. Thus, Capstone transferred risk to FinServ under the Federal Circuit analysis.

Risk is distributed under the Federal Circuit analysis when the insurance company spreads the assumed risk among policy holders. That is, the insurance company also insures other entities unrelated to the insured. Here, the undisputed facts show that Capstone was only 12.3% of FinServ's insurance business in 2016. FinServ also distributed risk by participating in PoolRe's quota-sharing risk pool with 78 other unrelated insurers. Capstone was only 0.002% of PoolRe's business in 2016. Thus, FinServ and PoolRe distributed Capstone's risk.

Under the Federal Circuit test, separate corporations—even if they are parents, subsidiaries, or corporate siblings—must be considered separate entities when evaluating whether the transaction between the insured and the insurance company resulted in risk shifting and risk distribution. If, however, FinServ or PoolRe was not separate company from Capstone but was, instead, a sham, then its corporate separateness may be ignored for purposes of determining whether risk transfer or risk distribution occurred. Here, the undisputed facts show that FinServ and PoolRe each had a business purpose and was engaged in business activity and they were, therefore, not shams. Indeed, FinServ and PoolRe reported income consistent with the statutes and rules for insurance companies without adjustment by the Internal Revenue Service (IRS). And the IRS conceded over two decades ago that it cannot rely on arguing that the corporations are part of the same economic family.

Accordingly, under the controlling Federal Circuit law, the insurance transactions were valid, Capstone was entitled to deduct the insurance premiums, and Capstone is entitled to summary judgment.

## II. Questions presented.

Payments for insurance premiums are deductible. Amounts set aside by a taxpayer for self-insurance are not deductible. The fundamental issue is whether the payments made by Capstone in 2016 to FinServ and PoolRe are for insurance or are they amounts simply set aside by Capstone to itself for self-insurance. In addressing this question, the Federal Circuit uses a three-part test. The Federal Circuit's test looks to (1) whether the insurance company is a separate company or a sham under the Supreme Court's decision in *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943)*,* and, applying the test for insurance under the Supreme Court's decision in *Helvering v. Le Gierse,* 312 U.S. 531 (1941), (2) whether the insured transferred risk to the insurance company, and (3) whether the insurance company distributed that risk.

Question no. 1—Sham analysis regarding FinServ: A corporation is not a sham if the corporation is organized for a business purpose or engaged in a business activity. FinServ's business purpose was insurance, and it engaged in business activity as evidenced by its satisfaction of regulatory and licensure requirements; adequate capitalization; issuance of written insurance contracts; maintenance of separate financial accounts; documentation of claims; and the IRS's acceptance of

FinServ’s tax returns as originally filed as an insurance company. Is FinServ a sham?

Question no. 2—Sham analysis regarding PoolRe: A corporation is not a sham if the corporation is organized for a business purpose or engaged in a business activity. PoolRe’s business purpose was insurance, and it engaged in business activity as evidenced by its having no common ownership, directors, or officers with Capstone and FinServ; satisfaction of regulatory and licensure requirements; adequate capitalization; issuance of written insurance contracts; maintenance of separate financial accounts; and the IRS’s acceptance of PoolRe’s tax returns as originally filed as an insurance company. Is PoolRe a separate corporation or a sham?

Question no. 3—Risk transfer: Insurance protects against the variability of loss, and risk is transferred when the insured’s variability of loss is reduced by the insurance transaction. Here, the insurance transaction reduced Capstone’s variability of loss because any payment of a claim of Capstone by FinServ or PoolRe would not negatively affect Capstone’s balance sheets or net worth. Did Capstone transfer risk to FinServ and PoolRe through the insurance contracts?

Question no. 4—Risk distribution: An insurance company distributes risk when it issues insurance contracts to other insureds; that is, it has insurance business unrelated to the taxpayer. Here, FinServ issued insurance contracts to insureds other than Capstone, and, accordingly, had insurance business unrelated to Capstone. Additionally, FinServ and PoolRe distributed risk through FinServ’s

participation in PoolRe's quota-share risk pool and through other unrelated business. Did FinServ and PoolRe distribute risk?

## III. Statement of the case.

This case is brought by Capstone, by and through Capstone Holdings Corporation, Tax Matters Partner, against the United States of America under section 6226 of the Internal Revenue Code (26 U.S.C.) (IRC) (2014) for judicial review of a final partnership administrative adjustment (FPAA). This case is governed under the partnership rules as adopted by the Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982. The Bipartisan Budget Act (BBA) of 2015 repealed the partnership provisions of TEFRA and adopted a new centralized partnership audit regime effective for tax years beginning after December 31, 2017, which are inapplicable to this case.

In the FPAA issued by the IRS to Capstone for tax year 2016, the IRS disallowed a deduction for insurance expenses of $239,773. But the undisputed facts show that Capstone properly deducted the claimed insurance expenses. Accordingly, the Court should grant summary judgment in favor of Capstone.

This case does not involve the tax treatment by FinServ or PoolRe of the premiums they received from Capstone in 2016. Although the IRS audited FinServ's 2016 federal income-tax return, it did not make any adjustments to FinServ's income or tax, thereby accepting both (i) FinServ's status as an insurance company, and (2) its treatment of Capstone's premium payments as premium income. As with

FinServ, the IRS accepted PoolRe's tax returns, which were filed as an insurance company.

A taxpayer may deduct insurance premiums under IRC § 162(a), which authorizes ordinary and necessary business deductions. Section 1.162-1(a) of the Treasury Regulations (26 C.F.R.) provides that insurance premiums are ordinary and necessary expenses. *See also Kidde Indus. v. Commissioner,* 40 Fed. Cl. 42, 50 (Fed. Cl. 1997) (stating that if payments are "properly characterized as 'insurance premiums[,]'" then they are deductible).

When a taxpayer insures with a corporate affiliate—whether the parent of the insurer or a corporate sibling of the insurer—the tax concern is whether the taxpayer is paying insurance premiums to a separate company or whether the taxpayer is, in effect, self-insuring. Captive insurance is the general term used to describe an insurance arrangement when the insurer is a corporate affiliate of the insured.

The controlling case in the Federal Circuit for determining whether insurance expenses in the captive context are deductible is *Ocean Drilling & Exploration Co. v. United States,* 988 F.2d 1135 (Fed. Cir. 1993). As explained herein, when analyzing the deductibility of insurance premiums in the captive context, the Federal Circuit test looks to three considerations, following the Supreme Court decisions in *Moline Properties* and *Le Gierse:* (1) whether the insure company is a separate entity from the insured or is a sham; (2) whether the insured

transferred risk to the insurance company; and (3) whether the insurance company distributed that risk.

Set forth below are the provisions of IRC § 162(a) and Treas. Reg. § 1.162-1(a) as they were applicable in 2016.

**A. IRC § 162(a) (2016).**

Section 162(a) of the IRC provides: "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business[.]"

**B. Treas. Reg. § 1.162-1(a) (2016).**

Section 1.162-1(a) of the Treasury Regulations provides: "Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business …. Among the items included in business expenses are … insurance premiums against fire, storm, theft, accident, or other similar losses in case of a business[.]"

**IV. Statement of argument.**

**A. Statement of facts.**

This case involves insurance purchased by Capstone from FinServ in 2016. As part of the insurance transaction, FinServ participated in PoolRe's quota-share risk pool. Capstone and FinServ are corporate siblings. PoolRe is unrelated to Capstone and FinServ. Capstone paid insurance premiums in 2016 of $147,595 to FinServ in 2016 and $92,178 to PoolRe.[1]

---

[1] Statement of facts (SOF), ¶¶ 85, 130.

### 1. Capstone Associated Services Ltd.

Capstone was established in 1998 as a Texas limited partnership, and remained as such at all relevant times.[2] In 2016, Stewart Feldman and Marla Matz, who are married, each owned 49.5% of Capstone as their separate property, while Capstone Holdings Corporation (Capstone Holdings) owned the remaining 1% and is its sole general partner.[3] Capstone Holdings is owned equally by Feldman and Matz as their separate property.[4]

Among other business activities, Capstone provides insurance underwriting and claims support, accounting and reporting services, and a range of administrative support services for small insurance companies.[5] In 2016, its insurance-company clients had more than $500 million in assets.[6] Capstone also administers export companies, known as domestic international sales companies, which were created by Congress to promote exports of domestic products.[7]

### 2. FinServ's operations.

In 2016, FinServ was an Anguilla company licensed by the Anguilla Financial Services Commission.[8] Anguilla is a British Overseas Territory of the United Kingdom.[9] Anguilla issued a Class B General license to FinServ.[10] Under

---

[2] SOF, ¶ 1.
[3] SOF, ¶ 4.
[4] SOF, ¶ 7.
[5] SOF, ¶ 2.
[6] SOF, ¶ 78.
[7] SOF, ¶ 3.
[8] SOF, ¶¶ 47, 53.
[9] SOF, ¶ 35.
[10] SOF, ¶ 47.

Anguilla law, FinServ was required to maintain paid-up capital of $100,000, which it always did.[11] As of the end of 2015, FinServ had total capital and surplus of $5,215,049.[12]

In 2016, Matz owned 61% of FinServ and was trustee of the trust that owned the remaining 39%.[13] Feldman had no ownership interest in FinServ.[14] FinServ was initially formed in 2006 in the British Virgin Islands and re-domiciled to Anguilla in 2009.[15] FinServ provided to regulators in Anguilla a complete application containing a business plan, pro forma financial statements, copies of policies, and several years of independent audits.[16] Since its inception and during their respective regulatory periods, FinServ has remained in good standing with the regulators from Anguilla and the British Virgin Islands.[17]

In 2016, FinServ received total premium revenue of $1,195,235 from three different lines of insurance.[18] First, FinServ received $590,381 of direct written premiums for issuing policies to insure the risks of 10 of its affiliated insureds, one of which was Capstone.[19] Second, FinServ received $368,712 from PoolRe for the risk that PoolRe ceded to it through FinServ's participation in the risk-sharing

[11] SOF, ¶ 56.
[12] SOF, ¶ 57.
[13] SOF, ¶ 43.
[14] SOF, ¶ 43.
[15] SOF, ¶¶ 42, 47.
[16] SOF, ¶¶ 38, 50.
[17] SOF, ¶ 58.
[18] SOF, ¶ 83.
[19] SOF, ¶ 83.

quota pool.[20] Third, FinServ received $236,141 in reinsurance premium payments for its participation in vehicle-service contracts ultimately ceded from Wesco Insurance Company, an unaffiliated, large, well-recognized, national insurer operating in all 50 states.[21]

Although a foreign corporation, the IRS formally accepted FinServ's election to be treated as a domestic corporation under IRC § 953(d) in March 2009.[22] Only insurance companies may make an IRC § 953(d) election. Similarly, FinServ elected to be treated as a small insurer under IRC § 831(b) for 2015 and 2016.[23] The IRS accepted FinServ's tax returns, which were filed as an insurance company.[24]

**3. The insurance contracts.**

In 2016, Capstone paid $147,595 in insurance premiums to FinServ for ten insurance policies.[25] These policies were:[26]

1. A commercial-crime policy relating to risks such as theft and embezzlement.
2. A cyber-risk policy relating to computer, network, and internet-related risks.
3. An employment-practices policy relating to employment-related risks like wage-and-hour disputes and harassment claims.
4. An impairment-of-collateral policy covering risks relating to the more than $200 million in financial instruments held by the insureds.

---

20 SOF, ¶ 83.
21 SOF, ¶ 83.
22 SOF, ¶ 132
23 SOF, ¶¶ 132, 178.
24 SOF, ¶ 178.
25 SOF, ¶ 85.
26 SOF, ¶ 85.

5. An intellectual-property policy covering risks relating to intellectual property.
6. A legal-expenses policy covering risks related to legal expenses incurred when (a) there is no underlying insurance to provide defense, (b) defense expenses provided by other insurance have been exhausted, or (c) a primary insurer's failure to defend a claim or cover a judgment
7. An expense-reimbursement policy relating to risks of public-relations expenses related to adverse publicity triggered by certain events.
8. A loss-of-services policy covering risks relating to business interruption due to the involuntary loss of services of a key person.
9. A regulatory-changes policy covering risks relating to regulatory changes adversely impacting the insured's business operations.
10. A business-interruption policy covering risks relating to impairment of the insured's business activities due to weather events.

The risks that Capstone insured are recognized as significant corporate risks. For example, according to the 2015 Aon Global Risk Management Survey, the top global risk threats include: (1) damage to reputation/brand; (2) business interruption; (3) cyber-attacks/data breach; (4) cash flow/liquidity risk; (5) regulatory/legislative changes; (6) distribution or supply chain failures; (7) counterparty credit risk; (8) political risk/uncertainties; (9) property damage; (10) environmental risk; (11) weather / natural disasters, (12) third-party liability (including error and omission); (13) technology failure/system failure; (14) failure of

disaster plan/business continuity; (15) injury to workers; (16) loss of intellectual property/data; (17) product recall; (18) directors & officers liability; (19) fraud; (20) unethical behavior; (21) theft; (22) terrorism/sabotage; and (23) harassment/discrimination.[27]

In addition to Capstone, FinServ also insured the following entities in 2016, which were all owned directly or indirectly by Stewart Feldman, Marla Matz, or both: (1) Feldman / Matz Interests, LLP (d/b/a The Feldman Law Firm; Stewart A. Feldman & Associates, L.L.P.; Feldman Hanzen LLP); (2) RSL Funding, LLC; (3) RSL-3B IL, Limited Partnership; (4) RSL Special-IV, Limited Partnership; (5) RSL-5B-IL, Limited Partnership; (6) Extended Holdings, Limited Partnership; (7) RSL 2012-1, LP; (8) Capstone Insurance Management (Anguilla), Ltd.; and (9) POC Lease Holdings, LLC.[28]

The Feldman Law Firm provides corporate, tax, and related litigation services to closely-held, non-public companies and their owners.[29] The RSL entities and Extended Holding are involved in the marketing, acquisition, packaging, and ongoing administration of structured settlements, usually arising from personal-injury actions; lottery proceeds; annuities; and other long-term financial instruments or arrangements.[30] In 2016, these entities held about $200 million in assets derived from more than 1,000 separate purchase agreements, consisting of

---

[27] SOF, ¶ 12.
[28] SOF, ¶ 92.
[29] SOF, ¶ 93.
[30] SOF, ¶ 93.

more than 10,000 prospective individual payments payable over decades.[31] Like Capstone, Capstone Insurance Management (Anguilla), Ltd. provides support for small businesses relating to captive-insurance programs.[32] POC Lease Holdings, LLC, held a ten-year lease on a 17,000 square-foot, full floor office in Houston, Texas.[33]

FinServ priced the lines of insurance based on pricing indications obtained from an independent insurance brokerage, which were then reviewed and adjusted by underwriting staff, including chartered property casualty underwriters (CPCU), of Capstone acting in its captive-consulting capacity.[34] A CPCU is a well-recognized professional designation earned through a professional organization in the property-and-casualty insurance industry.[35] As to most of the insurance lines, the pricing was also reviewed in 2016 or before by outside, independent actuaries in addition to the review by CPCUs.[36]

**4. The coverage provided by FinServ and FinServ's participation in the PoolRe quota-share risk pool.**

For each of the ten policies issued by FinServ to Capstone, there was a $25,000 deductible.[37] For nine of the ten policies, there was a $2 million policy limit

---

31 SOF, ¶ 93.
32 SOF, ¶ 94.
33 SOF, ¶ 88.
34 SOF, ¶¶ 110–15.
35 SOF, ¶ - n/a
36 SOF, ¶ 111, 124.
37 SOF, ¶ 96.

per claim.[38] For the tenth policy—the impairment-of-collateral policy—there was a $3 million policy limit.[39]

As to the nine policies with the $2 million policy limit, for losses below a certain threshold—the attachment point—FinServ was liable for the loss above the $25,000 deductible.[40] This amount is designated as the "primary coverage." The amount of loss over the primary coverage—designated as "excess coverage" or "stop-loss coverage"—was shared between FinServ and PoolRe in a 20% / 80% split, respectively. But PoolRe ceded its 80% share of the risk to a quota-share risk pool of 79 participating insurance companies, including FinServ. Through this ceding arrangement by PoolRe, the participants of the PoolRe quota-share risk pool were responsible for 80% of the excess coverage.[41] Thus, FinServ was liable for 20% of an excess-coverage claim while the members of the risk pool were liable for remaining 80% of the excess-coverage claim.[42]

The attachment point is 35% of the total direct written premiums and pooled premiums received by FinServ for the year.[43] For 2016, FinServ had total direct written premiums of $590,381 and pooled premiums of $368,712 for a total of $959,093.[44] The attachment point is 35% of this amount, which is $335,682. Thus, after FinServ's payment of $335,682 on a claim, any excess coverage would be

---

[38] SOF, ¶ 96.
[39] SOF, ¶ 96.
[40] SOF, ¶ 96.
[41] SOF, ¶ 97.
[42] SOF, ¶ 97.
[43] SOF, ¶ 99.
[44] SOF, ¶ 99.

shared by FinServ and the and the PoolRe quota-share risk pool with a 20% / 80% split, respectively.

To summarize, a $1 million loss that does not exceed the policy limits, for example, would be split as follows:

1. Deductible $25,000.

2. Primary coverage of FinServ in the amount of $335,682.

3. Excess coverage splitting the remaining amount of $639,318[45] between FinServ (20% or $127,863.60) and the PoolRe quota-share risk pool (80% or $511,454.40).

There were 78 other unrelated insurance companies, which were unrelated to FinServ, participating in PoolRe's quota-share risk pool.[46] The 79 licensed insurance companies in the pool insured a total of 275 insureds.[47] By blending the ceded risks in the quota-share risk pool and then ceding back the blended risk proportionally to the pool-participating insurance companies, PoolRe administered a risk-distributing mechanism whereby the pool-participating insurance companies distributed their exposure on 80% of the excess coverage to the other pool-participating insurance companies.[48] FinServ's quota share of PoolRe risk pool for 2016 was 1.3484%.[49]

---

[45] $1 million - $25,000 - $335,682 = $639,318.
[46] SOF, ¶ 101, 103.
[47] SOF, ¶ 99.
[48] SOF, ¶ 102.
[49] SOF, ¶ 103.

Any payment of a claim by FinServ did not negatively affect Capstone's balance sheets or net worth.[50]

**5. PoolRe's operations.**

For 2016, PoolRe was domiciled in and licensed as an insurance company by Anguilla.[51] PoolRe's business included issuing stop-loss insurance policies, administering the quota-share insurance program that FinServ participated in, and other insurance activities.[52] PoolRe was owned by Stephen L. Friedman.[53] In 2016, none of the insurance companies participating in PoolRe's quota-share insurance program had an ownership interest in PoolRe, nor did PoolRe have an ownership interest in any of the participating insurance companies.[54] At no time has Feldman, Matz, or any of their entities ever had any ownership interest in PoolRe nor have they shared common directors or officers.[55]

In 2016, PoolRe recorded $28,321,610 in revenue for direct written premiums related to the stop-loss insurance coverage mentioned above and $11,167,000 for reinsurance premiums.[56] It paid premiums of $28,321,610 for risk coverage it ceded to other unrelated insurance companies and $11,103,691 for reinsurance risk coverage it ceded to other unrelated insurance companies.[57] In 2016, the insurance

---

[50] SOF, ¶ 104.
[51] SOF, ¶ 68.
[52] SOF, ¶ 66–67.
[53] SOF, ¶ 64–65.
[54] SOF, ¶ 64-65.
[55] SOF, ¶ 71.
[56] SOF, ¶ 120.
[57] SOF, ¶ 120.

obligations that PoolRe assumed from its stop-loss insurance contracts, such as those with Capstone, were ceded to the quota-share risk-pool participants.[58] Thus, any excess loss incurred by a single member of the insurance pool over its own portion of the covered loss would have been shared with the other members in the quota-share risk pool.[59] Because there is no corporate relationship between Capstone and PoolRe, any payment of claims by PoolRe would not have negatively affected Capstone's balance sheets and net worth.[60]

Although a foreign corporation, the IRS formally accepted PoolRe's election to be treated as a domestic corporation under IRC § 953(d) in October 2009.[61] The IRS accepted PoolRe's tax returns, which were filed as an insurance company for all years of FinServ's existence.[62]

### 6. Claims Paid by FinServ in 2016.

In 2016, FinServ paid claims of $727,173 as shown in the following chart:[63]

| Insured | Corporate sibling of FinServ? | Coverage Type | Amount paid |
|---|---|---|---|
| Capstone | Yes | Legal | $2,500 |
| Capstone | Yes | Employment practices / legal | 56,250 |
| RSL-3B-IL, Ltd. | Yes | Collateral / legal | 3,750 |
| RSL-3B-IL, Ltd. | Yes | Collateral / legal | 25,000 |
| RSL Funding LLC | Yes | Collateral, IP, Legal | 157,500 |
| RSL Funding LLC | Yes | Employment practices / crime | 61,622 |
| RSL Funding LLC | Yes | Collateral / legal | 37,500 |
| RSL Funding LLC | Yes | Collateral / legal | 56,250 |

58 SOF, ¶¶ 120–121.
59 SOF, ¶ 120.
60 SOF, ¶ 120.
61 SOF, ¶ 63.
62 SOF, ¶ 69.
63 SOF, ¶ 134.

| | | | |
|---|---|---|---|
| RSL Funding LLC | Yes | Intellectual property / legal | 45,000 |
| Feldman Law Firm LLP | Yes | Employment practices | 35,000 |
| Feldman Law Firm LLP | Yes | Legal | 3,750 |
| Feldman Law Firm LLP | Yes | Employment practices | 7,500 |
| Aria (SAC) Ltd. | No | Reinsurance | 235,551 |
| **Total claims paid to FinServ's corporate siblings** | | | **$491,622** |
| **Total claims paid under unrelated reinsurance agreement** | | | **$235,551** |
| **Total claims paid overall in 2016** | | | **$727,173** |

FinServ received total net written premiums of $1,195,235.[64] Thus, in 2016, 67.6% ($491,622) [65] of the claims paid by FinServ went to corporate siblings and 32.4% ($235,551)[66] of the claims paid by FinServ went to an unaffiliated entity by operation of FinServ's reinsurance agreement with PoolRe regarding participation in a contractual liability reinsurance program regarding vehicle-service contracts. The payment of these claims by FinServ did not result in any charge against Capstone's balance sheets or net worth.[67]

**7. Shared-services agreement.**

In 2016, Capstone was part of a shared-services agreement (SSA) with Feldman Law Firm, RSL Funding, and Capstone Holdings Corporation.[68] The SSA facilitated the administrative and financial convenience of these entities. The Feldman Law Firm acted as the servicing agent of the three other parties to the agreement having custody of their some of their financial assets. As their agent under the agreement, it collected their receivables and paid certain expenses.[69]

---

64 SOF, ¶ 83.
65 $491,622 / $727,173 = .676
66 $235,551 / $727,173 = .324
67 SOF, ¶ 104.
68 SOF, ¶ 150
69 SOF, ¶ 152.

Essentially, Feldman Law Firm acted as the administrative and office manager of the other parties to the agreement. As the agent of Capstone, Feldman Law Firm paid Capstone's insurance premiums to FinServ and PoolRe, and reduced Capstone's custodial account at Feldman Law Firm.[70]

As Capstone's agent under the agreement, Feldman Law Firm collected a total of $9,203,183.11 and paid total expenses of $7,265,248 in 2016.[71] Of this amount, the IRS disallowed only the $239,773 in insurance expenses paid to FinServ and PoolRe, which is only 3% of the $7,265,248 expenses paid by Feldman Law Firm on behalf of Capstone during 2016.[72] The IRS did not disallow Capstone's deductions for the other $7-plus million in expenses paid on its behalf by Feldman Law Firm.[73] This included the deduction for the payment of Capstone's insurance expenses to A.M.Y. Property and Casualty Insurance Corporation, another captive insurance company that Capstone had been an insured with and that had been operating with approval by the IRS for more than a decade.[74]

Wholly consistent with the SSA, the IRS did not reallocate any of the receipts collected by FinServ on behalf of Capstone as receipts from another.[75] That is, the IRS respected the allocations resulting from the SSA. The result is a lack of parity in the IRS's handling of the SSA.

---

[70] SOF, ¶ 159.
[71] SOF, ¶ 159.
[72] SOF, ¶ 177.
[73] SOF, ¶ 177.
[74] SOF, ¶ 86, 168.
[75] SOF, ¶ 177.

**8. FinServ audit.**

The IRS audited FinServ for tax year 2016 and closed the audit with no change in the amount of tax due or any other reported amount.[76] FinServ filed its 2016 tax return with IRC §§ 831(b) and 953(d) elections in effect.[77] Section 831(b) allows a small insurance company to be taxed only on its investment income. Without the special treatment provided by Congress in IRC § 831(b), an insurance company is taxed on its gross income ( investment income and its underwriting income defined as premiums earned less losses and expenses incurred). IRC §§ 831(a); 832(a), (b)(1), and (b)(3). By making an election under IRC§831(b), FinServ forgoes claiming a deduction for insurance losses claims and expenses. Consistent with its IRC § 831(b) election, FinServ reported as taxable income and paid tax on its investment income as allowed by IRC § 831(b).[78]

**9. The Internal Revenue Service's IRC § 6700 examination.**

In June 2015, the IRS notified Stewart Feldman and Capstone that it was considering penalties under various provisions of the IRC including §§ 6700 and 6701 which relate to promoting abusive tax shelters and aiding and abetting the understatement of tax liability.[79] Nearly four years later, after an exhaustive examination, meetings with the IRS and producing over 100 boxes of information, the IRS closed its examination of Stewart Feldman without taking any action. As

[76] SOF, ¶ 178.
[77] SOF, ¶ 178.
[78] SOF, ¶ 178.
[79] SOF, ¶ 180.

with all time periods, the filed tax returns for FinServ and PoolRe as insurers were not adjusted, even following FinServ's multiyear IRS audit.[80]

**B. Summary-judgment standard and related general principles of law.**

Under Rule 56 of the Rules of the Court of Federal Claims, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). "With regard to materiality, only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Monsanto Co. v. Scruggs,* 459 F.3d 1328, 1334 (Fed. Cir. 2006) (internal quotation marks and citation omitted). A fact is material when it "might affect the outcome of the suit[.]" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute is genuine, thus necessitating a trial, when a finder of fact may resolve factual issues in favor of either party. *Id.* at 250.

Contract interpretation is a question of law. *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.,* 967 F.3d 1339, 1345 (Fed. Cir. 2020); *Premier Office Complex of Parma, LLC v. United States,* 916 F.3d 1006, 1011 (Fed. Cir. 2019) (stating that contract interpretation is question of law).

The proper characterization of a transaction for tax purposes is a question of law. *Frank Lyon Co. v. United States,* 435 U.S. 561, 581 n. 16 (1978); *Salem Fin., Inc. v. United States,* 786 F.3d 932, 940 (Fed. Cir. 2015) ("The characterization of a

80 SOF, ¶ 181.

transaction for tax purposes is a question of law that is subject to de novo review, while the underlying facts are reviewable for clear error.”).

Conflicting expert opinions of a legal issue does not raise an issue of fact. *Peterson Mfg. Co. v. Central Purchasing, Inc.,* 740 F.2d 1541, 1548 (Fed. Cir. 1984) (determining that the issue of obviousness is a legal question and that expert opinions regarding the issue of obviousness do not raise an issue of fact precluding summary judgment). Moreover, a court’s decision on a legal issue does not constitute an adverse inference precluding summary judgment. *Id. See also Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,* 731 F.2d 831, 837 (Fed. Cir. 1984) (noting distinction between legal conclusion and adverse inference in summary-judgment context). “[T]he requirement to draw favorable ‘inferences’ relates only to *factual* inferences, not to legal conclusions based on an established set of facts, even if those facts do not all favor that conclusion.” *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 767 (Fed. Cir. 1988) (emphasis in original).

Accordingly, despite contrary expert reports, some contrary undisputed facts, and some disputed but immaterial facts, a court may grant summary judgment where the undisputed material facts support the legal conclusion that the movant is entitled to judgment as a matter of law. *See Peterson Mfg.,* 740 F.2d at 1548; *Newell Cos.,* 864 F.2d at 768; *Structural Rubber Prods. Co. v. Park Rubber Co.,* 749 F.2d 707, 721 (Fed. Cir. 1984) (“That the parties fervently dispute the ultimate conclusion of obviousness [a legal question] is not enough to raise a factual issue.”).

In deciding cases, a court should only apply standards that are consistent with the governing statutes. *Cf. id.* at 723 ("A patentee, as well as an infringer, is entitled to have its position judged only by the standard which Congress has written into the statute.").

**C. The purported tax harm.**

The fundamental issue in the case is whether the payments from Capstone to FinServ and PoolRe are for insurance, which is tax deductible, or are amounts set aside for a loss reserve as a form of self-insurance, which is not tax deductible. *See Ocean Drilling,* 988 F.2d at 1138 (stating that issue before the court was whether payments made by a parent company to its wholly owned Bermuda insurer was a reserve for losses or insurance premiums). When a corporation sets asides funds for payment of future loss claims, the tax law allows a deduction for the loss only in the year in which the loss is realized. *See Kidde,* 40 Fed. Cl. at 46. That is, amounts set aside on their books for a loss reserve as a form of self-insurance are not deductible in the year they are set aside. *See Harper Group v. Comm'r,* 96 T.C. 45, 46 (T.C. 1991). Insurance premiums on the other hand are deductible in the year they are paid. IRC § 162(a); Treas. Reg. § 1.162-1(a); *Ocean Drilling,* 988 F.2d at 1144.

In captive cases, then, the fundamental issue is whether the taxpayer can take a deduction now for the insurance premium paid to the affiliated insurance company, or whether the taxpayer has merely self-insured, in which case the deduction may only be taken later, when the loss is realized. Thus, the tax concern is one of timing of the deduction.

## D. The Federal Circuit's test for the deductibility of premium payments in captive cases.

The Federal Circuit's decision in *Ocean Drilling* established the applicable legal test for determining whether insurance premiums are deductible in captive cases. This test is controlling law on this Court. *Tex. Am. Oil Corp. v. Dep't of Energy,* 44 F.3d 1557, 1561 (Fed. Cir. 1995) ("This court applies the rule that earlier decisions prevail unless overruled by the court en banc, or by other controlling authority such as intervening statutory change or Supreme Court decision."). This Court is bound to apply the Federal Circuit's test. *Cobert v. Miller,* 800 F.3d 1340, 1349 (Fed. Cir. 2015) (determining that the Merit Systems Protection Board "erred as a matter of law in abandoning" the two-step legal standard set forth by the Federal Circuit). *See also Hart v. Massanari,* 266 F.3d 1155, 1170 (9th Cir. 2001) (stating that "caselaw on point *is* the law. If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect. Binding authority must be followed unless and until overruled by a body competent to do so."); *Sauer West LLC v. United States,* 157 Fed. Cl. 619, 632–33 (Fed. Cl. 2022) (observing that the Federal Circuit's explanation of a causation standard "was not a mere aside—it was necessary to the outcome of the case[,]" and the court was bound to follow that precedent). *Cf. Seminole Tribe v. Florida,* 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound.").

The Federal Circuit's decision in *Ocean Drilling* is precedential. There is no indication in the reported case that it is nonprecedential. Fed. Cir. R. 32.1(a) ("A nonprecedential disposition must bear a legend designating it as nonprecedential. A precedential disposition will bear no legend."). While the Federal Circuit's analysis and holding are contained in the appendix consisting of the decision of the Claims Court, the Federal Circuit adopted that analysis and holding as its own. *Ocean Drilling,* 988 F.2d at 1137 ("We adopt the analysis and holding on these issues as set forth in the Claims Court's opinion, which is attached as an appendix."). *See also Kidde,* 40 Fed. Cl. at 46 (noting that *Ocean Drilling* is a Federal Circuit opinion, and opinions of the Federal Circuit are binding on the Court of Federal Claims).

**1. The Federal Circuit's decision and analysis in *Ocean Drilling.***

Ocean Drilling & Exploration Company established a wholly owned subsidiary, Mentor Insurance Limited, to provide specialized insurance for mobile drilling rigs. *Ocean Drilling,* 988 F.2d at 1138. Mentor was incorporated in Bermuda, was initially capitalized with the minimum amount of capitalization required by Bermuda law, and shared key officers and employees with Ocean Drilling. *Id.* at 1138–39, 1141–42. The IRS determined that the premiums paid by Ocean Drilling to Mentor "amounted to self insurance" and, therefore, were not an allowed business expense. *Id.* at 1143.

The Federal Circuit emphasized that its analysis of the question of the deductibility of captive insurance was governed by the Supreme Court's decisions in *Moline Properties* and *Le Gierse:* "This court must adhere to the principles of *Le*

*Gierse* and *Moline Properties* in reaching a decision. Plaintiff [the insured] and Mentor [the insurance company] must be considered as separate entities in evaluating whether the transactions between the two companies resulted in risk shifting and risk distributing." *Ocean Drilling,* 988 F.2d at 1150. "Since risk shifting and risk distributing were present, the court finds that insurance exists as outlined in *Le Gierse.* Thus, the payments by plaintiff to Mentor constituted insurance and were allowed to be deducted from taxable income." 988 F.2d at 1153.

In *Ocean Drilling,* the Federal Circuit's analysis focused on three considerations, following the Supreme Court decisions in *Moline Properties* and *Le Gierse:* (1) whether the insurance company is a separate entity from the insured or is a sham; (2) whether the insured transferred risk to the insurance company; and (3) whether the insurance company distributed that risk. In *Ocean Drilling,* the Federal Circuit surveyed prior decisions from various circuits and the Tax Court addressing captive insurers, but noted that they were not binding precedent on the court. *Ocean Drilling,* 988 F.2d at 1135.

Notably, the IRS accepts the position that a captive insurance company, its parent, and siblings should not be considered as one economic family—that is, as one unit—in assessing whether risk-shifting and risk-distribution occurred. Rev. Rul. 2001-31 (rejecting economic-family analysis for captive insurance); *Rent-A-Center Inc. v. Comm'r,* 142 T.C. 1, 25 (T.C. 2014) (Buch, J. concurring) ("Because Rev. Rul. 2001-31 has not been revoked, we could treat the economic family argument as conceded.").

The first issue addressed by the Federal Circuit in *Ocean Drilling* was whether Mentor's separate corporate status was a sham. 988 F.2d at 1151. That is, was it a valid insurance company? *Id.* Regarding *Moline Properties,* the Federal Circuit in *Ocean Drilling* stated that under *Moline Properties:* "a corporation with a legitimate business purpose must be treated as 'a separate taxable entity.' Thus, *Moline Properties* stands for the proposition that a parent corporation and its subsidiary corporation be accorded treatment as separate taxable entities." *Id.* at 1144. *See also Ford Motor Company v. United States,* 908 F.3d 805, 809-810 (Fed. Cir. 2018) ("This separate taxability [between parent and subsidiary] does not depend on the degree of a subsidiary's independence from its parent. 'Complete ownership of the corporation, and the control primarily dependent on such ownership … are no longer of significance in determining taxability.'" (*quoting Nat'l Carbide Corp. v. Comm'r,* 336 U.S. 422, 429 (1949)); *Vaughn v. United States,* 740 F.2d 941, 943 (Fed. Cir. 1984) (stating that in *Moline Properties,* the Supreme Court "made it clear that a taxpayer cannot establish a corporation for business purposes and then expect that it be ignored for federal tax purposes.").

Under *Moline Properties,* a corporation is not a sham so long as the corporation is organized for a business purpose or carries on a business activity. 319 U.S. at 439 ("[S]o long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.").

In considering whether the insurance company was a sham under *Moline Properties,* the Federal Circuit in *Ocean Drilling* pointed to several facts supporting its conclusion that the insurance company was a not sham and was a valid insurance company including: there were true hazards that were real possibilities that could result in losses; the parties understood they were in an insurance relationship; the insurance contracts were written and premiums were paid; unrelated parties reinsured policies that Mentor wrote for Ocean Drilling; the premiums charged to Ocean Drilling were based on commercial rates in London; the validity of the claims was established before payments were made on them; the claims were paid from Mentor's funds that were separate from Ocean Drilling's funds; Mentor's capitalization was adequate; the policies Mentor entered into were valid and binding; and Mentor's business operations were separate from the taxpayer's. *Ocean Drilling,* 988 F.2d at 1151. The Federal Circuit concluded that, "[c]umulatively, these facts indicate that Mentor's existence as an insurance company was valid and not a sham." *Id.* The Court found that Mentor was not a sham despite "the overlap in several key employees and officers and … plaintiff's control over the investment of some of Mentor's funds." *Id.* at 1151 n. 23. "Having examined all the factors, the court finds that Mentor's business operations were separate from those of plaintiff." *Id.*

The Federal Circuit's sham analysis is a facts-and-circumstances test to determine if the insurance company should be treated as a separate entity from the insured. Again, the fundamental question is whether the insured is self-insuring or

whether the insured is transferring risk to an insurer with separate corporate existence. The facts supporting the Federal Circuit's determination that Mentor, the insurance company, was not a sham, are not required elements or factors for the determination of insurance. The required elements of insurance under the Federal Circuit's test are simply risk transfer and risk distribution. *See, e.g., id.* at 1153 ("Since risk shifting and risk distributing were present, the court finds that insurance exists as outline in *Le Gierse.*").

**2. Risk shifting.**

Once the Federal Circuit in *Ocean Drilling* determined that the insurance company was not a sham, it turned to the question of whether risk was shifted from the insured to the insurance company. *Ocean Drilling,* 988 F.2d at 1151. The Federal Circuit referred to *Le Gierse* for the requirements of insurance: "In *Le Gierse,* the Supreme Court stated that 'insurance involves risk-shifting and risk-distributing…." *Id.* at 1144 (quoting *Le Gierse,* 312 U.S. at 539) (omission in original). *See also Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211 (1979) ("The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk.").

Risk shifting is determined by whether the insurance contract reduced the variability of loss of the insured. *Ocean Drilling,* 988 F.2d at 1151 ("Insurance protects against the variability of loss."). *See also Kidde,* 40 Fed. Cl. at 53 ("The risk to which *Le Gierse* refers is the risk that in the future a corporation will face

uncertain and variable claims against it." (*citing Ocean Drilling,* 988 F.2d at 1151; *Sears, Roebuck & Co. v. Comm'r,* 972 F.2d 858, 862 (7th Cir. 1992)).

The Court in *Ocean Drilling* focused solely on the presence of Mentor's unrelated business and its effect on the variability of loss as to Ocean Drilling (the insured) and Mentor (the insurer). *Ocean Drilling,* 988 F.2d at 1142 ("Unlike this Court's analysis, the Tax Court's discussion of risk transfer did not focus solely on the amount of unrelated business.").

In *Kidde,* the Court of Federal Claims was faced with two distinct questions: (1) whether risk was transferred from the parent to its wholly owned subsidiary insurance company; and (2) whether risk was transferred from the parent's other subsidiaries to their common parent's wholly owned insurance subsidiary. The court concluded that the parent did not transfer risk to the subsidiary, but that the parent's subsidiaries transferred risk to their corporate-sibling insurance company. *Kidde,* 40 Fed. Cl. at 58.

The court in *Kidde* explained the concept of the variability of loss in *Ocean Drilling*. "[T]he Federal Circuit [in *Ocean Drilling*] determined that risk shifting cannot be established simply by showing that the captive insurer was a separate corporation that was legally responsible for claims against the parent. Rather, the court distinguished between two concepts—the level of risk transferred to the captive insurer and the level of risk ultimately shouldered by the parent. If the risk ultimately shouldered by the parent is less than the risk transferred, then the required risk shifting has occurred. If the two levels of risk are the same, however,

then no risk shifting occurred even though the captive insurer has become legally responsible for the parent's claims. The Federal Circuit rested its position that the parent shifted risk, *i.e.,* shifted the variability of loss, on its conclusion that 'because (the captive insurer) had unrelated business, (the) level of risk (transferred) was not retained by … the parent." *Kidde,* 40 Fed. Cl. at 57. "Hence, from the parent's perspective, when risks faced by the parent become the responsibility of the wholly owned subsidiary, and the subsidiary in turn combines those risks with other independent risks of corporations unrelated to the parent, the net effect is that the parent will shoulder less risk because it has lower variability of loss than it faced before it entered the arrangement with its subsidiary." *Id.*

The question of risk transfer then is, ultimately, whether the insurer had a separate corporate identity from the insurance company and whether the insurance company has other insurance business than that of the insured. *Ocean Drilling,* 988 F.2d at 1152 ("Unlike this Court's analysis, the Tax Court's discussions of risk transfer did not focus solely on the amount of unrelated business.").

Noting the corporate separateness between the corporate siblings and the lack of any economic effect on the sibling insured by payment of claims by the sibling insurer, the Court of Federal Claims in *Kidde* found that risk was transferred. *Kidde,* 40 Fed. Cl. at 55–56. "When these separately incorporated subsidiaries are so treated [as separate corporate entities under *Moline Properties*] the contractual arrangement pursuant to which KIC [the insurer] assumed responsibility for the subsidiaries' future claims would involve the shifting of risk

away from these subsidiaries in the same way as if the subsidiaries secured insurance from an independent third-party insurer." *Id.* at 56. "As explained in *Humana,* 881 F.2d 247, at 253, the wholly owned subsidiaries have no ownership interest in the parent's captive insurer and hence would not suffer any additional loss if payments by the captive insurer of future claims against the subsidiaries exceeded the amount of premiums the captive insurer received." *Kidde,* 40 Fed. Cl. at 56 (*citing Humana Inc. v. Comm'r,* 881 F.2d 247 (6th Cir. 1989)). That is, a payment by the insurer of a $1,000 claim "would not result in a corresponding decrease in [the insured subsidiary's] net worth[.]" *Kidde,* 40 Fed. Cl. at 56.

Thus, under controlling Federal Circuit law, the test for risk transfer focuses on whether the insured has decreased its variability of loss through the insurance transaction.

**3. Risk distribution.**

Risk distribution involves the spreading of risks by the insurance company among policyholders. *Ocean Drilling,* 988 F.2d at 1153. In *Ocean Drilling,* the Federal Circuit determined that risk was distributed because the insurance company had "unrelated business of approximately 44 and 66 percent for the two years at issue." *Id.* The Federal Circuit noted that the Tax Court found risk distribution to exist in *Harper,* in which the Tax Court determined that 30% of gross premiums from unrelated parties was sufficient for risk distribution. *Ocean Drilling,* 988 F.2d at 1153; *Harper,* 96 T.C. at 59–60 and n. 10.

In *Kidde,* the court concluded that risk distribution occurred because the corporate-sibling insurance company distributed the risk of each of its insured corporate siblings with the risks of its other insured corporate siblings. *Kidde,* 40 Fed. Cl. at 56 ("[W]hen viewed from the perspective of that subsidiary, risk distribution also took place in that KIC [the insurer] distributed the risk faced by that subsidiary in a pool with the risks of other entities in which the subsidiary did not have an ownership interest."). *Cf.* Rev. Rul. 2001-31 (rejecting economic-family analysis for captive insurance); *Rent-A-Center Inc.,* 142 T.C. at 25 (Buch, J. concurring) ("Because Rev. Rul. 2001-31 has not been revoked, we could treat the economic family argument as conceded.").

**E. The insurance contract between Capstone and FinServ is an insurance contract.**

**1. FinServ was a separate corporation from Capstone and was not a sham.**

The first question is whether FinServ is a separate corporation or a sham such that no risk was transferred from Capstone. *See Ocean Drilling,* 988 F.2d at 1150. Under *Moline Properties,* a corporation is not a sham so long as the corporation is organized for a business purpose or actually carries on a business activity. *Moline Properties,* 319 U.S. at 439.

Here, the undisputed facts show that FinServ was organized for a business purpose and carried on business activity. In 2016, FinServ was an Anguilla

company licensed by the Anguilla Financial Services Commission (AFSC).[81] The AFSC issued a Class B General license to FinServ.[82] Under Anguilla law, FinServ was required to maintain paid-up capital of $100,000.[83] FinServ had such capital at all times during its existence and as of the beginning of 2016, had total capital and surplus of $5,215,049.[84] FinServ satisfied all regulatory requirements imposed on it by Anguilla.[85]

FinServ maintained separate financial accounts.[86] FinServ issued written insurance policies that covered recognized risks appropriate to Capstone's business.[87] In determining pricing of the insurance policies, FinServ relied on third-party quotations, as adjusted by CPCUs and reviewed in most instances by outside, independent actuaries.[88] FinServ paid claims in 2016, determined that the claims paid were proper under the applicable insurance coverage, and documented those claims.[89]

While a foreign corporation, the IRS approved FinServ's election to be treated as a domestic corporation under IRC § 953(d) in March 2009.[90] Only qualifying small insurers may so elect. FinServ elected to be treated as a small insurer under

---

[81] SOF, ¶ 47.
[82] SOF, ¶ 47.
[83] SOF, ¶ 56.
[84] SOF, ¶¶ 56–57.
[85] SOF, ¶ 58.
[86] SOF, ¶ 133.
[87] SOF, ¶¶ 12, 85.
[88] SOF, ¶¶ 110–15
[89] SOF, ¶¶ 134–42.
[90] SOF, ¶ 132.

IRC § 831(b) for 2015 and later years.[91] Section 831(b) in 2016 allowed an insurance company that received no more than $1.2 million in net written premiums to pay tax only on its investment income, while foregoing the ability to deduct insurance losses. Consistent with its IRC § 831(b) election, FinServ reported and paid tax on its investment income.[92] The IRS audited FinServ's 2016 federal tax return and made no adjustments to the tax due or any other reported item.[93]

Accordingly, based on the undisputed facts, FinServ is a separate company under *Moline Properties* from Capstone.

**2. PoolRe was a separate corporation from Capstone and was not a sham.**

Here, the undisputed facts show that PoolRe was organized for a business purpose and carried on business activity. In 2016, PoolRe was an Anguilla company licensed by its AFSC. AFSC issued a Class B General license to PoolRe.[94] Under Anguilla law, PoolRe was required to maintain paid-up capital of $100,000.[95] As of the beginning of 2016, PoolRe had total capital and surplus of $185,407.[96] PoolRe satisfied all regulatory requirements imposed by Anguilla.[97]

[91] SOF, ¶¶ 132, 178.
[92] SOF, ¶ 178.
[93] SOF, ¶ 178.
[94] SOF, ¶ 63, 68.
[95] SOF, ¶ 56.
[96] SOF, ¶ 74.
[97] SOF, ¶ 74.

PoolRe's business included issuing stop-loss insurance policies, administering the quota-share insurance program, and other insurance activities.[98] PoolRe was owned by Stephen L. Friedman.[99] At no time has Feldman, Matz, or any of their entities ever had any ownership interest in PoolRe nor have they shared common directors or officers.[100] PoolRe maintained financial accounts with separate institutions from Capstone and FinServ.[101] PoolRe's insurance contracts were documented by written instruments and were with unrelated entities.[102] A total of 79 unrelated insurance companies, including FinServ, participated in PoolRe's quota-share risk-sharing pool, covering more than 275 named insureds.[103] The IRS accepted PoolRe's tax returns, which were filed as an insurance company.[104]

Accordingly, based on the undisputed facts, PoolRe is a separate company under *Moline Properties* from Capstone.

**3. The insurance contracts between FinServ, PoolRe, and Capstone transferred Capstone's risk.**

Insurance protects against the variability of loss, and risk is transferred when the insured's variability of loss is reduced by the insurance contact. *Ocean Drilling,* 988 F.2d at 1151; *Kidde Indus.,* 40 Fed. Cl. at 53. Here, the undisputed facts show that the insurance contracts reduced Capstone's variability of loss.

---

98 SOF, ¶¶ 66–67.
99 SOF, ¶¶ 64–65.
100 SOF, ¶ 71.
101 SOF, ¶ 74.
102 SOF, ¶ 75-77.
103 SOF, ¶ 101.
104 SOF, ¶ 69.

Under *Moline Properties,* corporate subsidiaries are treated as separate entities from one another and from the common corporate parent. *Kidde,* 40 Fed. Cl. at 55–56. Thus, Capstone, as a corporate sibling of FinServ, would not suffer any additional loss when its sibling insurance company pays out an insurance claim. Because Capstone and FinServ do not own stock in each other, when a covered loss of Capstone's is paid by FinServ, Capstone's balance sheets and net worth are not negatively affected by the payment of a covered claim by FinServ. *See Kidde,* 40 Fed. Cl. at 42–43 (finding that payment of claim by insurer that is the corporate sibling of the insured would not result in the decrease of the insured's net worth). Thus, Capstone's variability of loss was reduced by the insurance contracts.

In 2016, FinServ paid 12 claims totaling $491,622 to its sibling insureds, including $58,750 to Capstone for two claims.[105] Because Capstone is a corporate sibling of FinServ, its balance sheets and net worth were not negatively affected by the payment by FinServ of any of these claims. Similarly, there is no corporate relationship between Capstone and PoolRe. Accordingly, any claims paid by PoolRe would not adversely affect Capstone's balance sheets and net worth.

And so, the undisputed facts established that risk was transferred from Capstone to FinServ and PoolRe.

**4. FinServ and PoolRe distributed Capstone's risk.**

An insurance company distributes risk when it issues insurance contracts to other insureds; that is, it has insurance business unrelated to the taxpayer. *Ocean*

---

[105] SOF, ¶ 134.

*Drilling,* 988 F.2d at 1153. Here, FinServ issued insurance contracts to insureds other than Capstone, and, accordingly, had unrelated insurance business relative to Capstone and distributed Capstone's risk.

In addition to insuring Capstone in 2016, FinServ also (1) insured nine corporate siblings; (2) participated in a quota-sharing risk pool with 78 other insurance companies insuring a total of 275 insureds; and (3) participated in a contractual liability reinsurance program regarding vehicle-service contracts through PoolRe.[106] FinServ's total net written premiums in 2016 were $1,195,235, of which $147,595 came from Capstone.[107] Thus, in terms of total net premiums, Capstone was only 12.3% of FinServ's business.[108] As noted, *Moline Properties* requires the Court to treat Capstone and its corporate siblings as separate entities for purposes of determining risk distribution. *See Ocean Drilling,* 988 F.2d at 1144; *Kidde,* 40 Fed. Cl. at 55–56. Because only 12.3% of FinServ's premiums came from Capstone, FinServ had unrelated business of 87.7% and, consequently, distributed the risk that Capstone transferred to FinServ. *See Ocean Drilling,* 988 F.2d at 1153 (finding risk distribution when unrelated business was 44% and 66% of the insurer's business during the tax years in question); *Harper* (cited by *Ocean Drilling* as a comparison), 96 T.C. at 59–60 and n. 10 (finding that risk distribution was present when unrelated business was 30% of the insurer's business); *Kidde,* 40 Fed.

---

106 SOF, ¶ 101.
107 SOF, ¶¶ 83, 85.
108 $147,595 / $1,195,235 = .123.

Cl. at 55–56 (finding parent's subsidiaries transferred risk to their corporate-sibling insurance company).

The same conclusion obtains as to PoolRe. The insurance premiums paid by Capstone to PoolRe were $92,178, which is 0.002% of PoolRe's $39,488,610 in revenue.[109] As to FinServ, its participation in the PoolRe risk pool was its quota share of 1.3484%.[110]

And so, the undisputed facts established that the risk that was transferred from Capstone to FinServ and PoolRe was distributed by those insurance companies.

**F. Penalties.**

In the 2016 Capstone FPAA, the IRS added a 20% accuracy-related penalty under IRC 6662 on the two following alternative grounds: (1) negligence or disregard of or rules or regulations, and (2) a substantial understatement of income tax. Because this is a partnership-level proceeding under IRC § 6226, the Court has jurisdiction to determine the initial applicability of the penalty based on the partnership return. IRC § 6226(f).

If the Court finds that Capstone was entitled to claim the deduction for the insurance premiums, then the penalty is invalid because there was no understatement of income tax due to the insurance premiums.

109 SOF, ¶ 120.
110 SOF, ¶ 103.

## V. Conclusion.

Whether Capstone is entitled to deduct insurance premiums it paid to FinServ and PoolRe in 2016 is determined under the Federal Circuit's controlling test in *Ocean Drilling,* which examines whether the insurance companies are separate companies or sham, whether risk was transferred from the insured to the insurance company, and whether the insurance company distributed that risk.

Here, FinServ and PoolRe are separate companies from Capstone, each with their own business purpose and each conducting their own business activities. Any payouts on the insurance contracts would not adversely affect Capstone's balance sheets and net worth. Further, Capstone was only 12.3% of FinServ's business and 0.002% of PoolRe's business. Thus, the insurance contracts transferred risk from Capstone to FinServ and PoolRe and those companies distributed that risk. Capstone is entitled to claim the deductions and is entitled to summary judgment.

December 15, 2025

s/Chad Nardiello
CHAD D. NARDIELLO
Attorney of Record
Nardiello Turanchik Tompkins LLP
1801 Century Park East, Suite 1050
Century City, California 90067
(310) 201-0123 ext. 101
(310) 201-0126 (facsimile)
chad@nt-llp.com

BENJAMIN L. TOMPKINS
ANDREW T. PRIBE
Of Counsel
Nardiello Turanchik Tompkins LLP

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2025, notice of filing of this document was made by delivery of the notice of electronic filing that is automatically generated by ECF on the following registered ECF users:

Joseph A. Sergi
U.S. Department of Justice
Tax Litigation Branch, Civil Division
P.O. Box 14198
Washington, D.C. 20044
Email: Joseph.A.Sergi@usdoj.gov

s/ Chad Nardiello -
CHAD D. NARDIELLO
Attorney of Record
Nardiello Turanchik Tompkins LLP
Attorney for Plaintiff