IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 21-913 T
(Judge Kathryn C. Davis)

CAPSTONE ASSOCIATED SERVICES, LTD.,
by and through CAPSTONE HOLDINGS CORP.,
Tax Matters Partner,
Plaintiff,

v.

UNITED STATES,
Defendant.

**DEFENDANT'S REPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

February 3, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

JASON A. BERGMANN
Assistant Director
JOSEPH A. SERGI
MARGARET E. SHEER
AMANDA J. CORNWELL
ANTHONY COGNASI
Tax Litigation Branch
Civil Division
Department of Justice
P.O. Box 26
Washington, DC 20044
Tel.: (202) 307-6627
joseph.a.sergi@usdoj.gov

## TABLE OF CONTENTS

**Page**

**INTRODUCTION** ..................................................................................................... **1**

I. MICRO-CAPTIVES: AN OVERVIEW. ........................................................................ 4

*A. Micro-captives, defined. ........................................................................ 4*

*B. Micro-captives have unique potential for abuse. ............................................ 7*

*C. Legal landscape: challenging abusive micro-captives. .................................... 9*

II. SUMMARY JUDGMENT IS NOT THE VEHICLE TO RESOLVE GENUINE DISPUTES AND QUESTIONS OF CREDIBILITY. ........................................................................ 14

*A. FinServ lacks the unrelated risks required for risk-shifting. ........................ 16*

*B. None of FinServ's alleged risk distribution strategies achieve their goals. . 20*

1. FinServ's own policies are not spread among unrelated risks. ................ 21

2. PoolRe's quota share contracts lack multiple indicia of insurance, and so do not distribute risk. ........................................................................ 23

3. PoolRe served as vehicle to shift funds to and from captives using a circular cash flow. ........................................................................ 24

*C. PoolRe did not face actual and insurable risk. ............................................ 25*

1. The quota share policies were not the result of arm's length negotiations. 26

2. PoolRe did not charge actuarially determined premiums. ....................... 27

3. Plaintiff has not established that PoolRe's coinsurance contracts existed, or what amount of risk they distribute. ........................................................ 28

*D. FinServ is not insurance in the commonly accepted sense. .......................... 30*

1. Doubt surrounds whether Capstone paid its premiums. ........................... 31

2. FinServ did not make "traditional investments." .................................... 32

3. FinServ's claim processing and payment were idiosyncratic. .................. 34

III. THE MOTION IS PLAGUED BY ISSUES OF EVIDENTIARY WEIGHT: MATERIALITY AND CREDIBILITY ........................................................................ 35

IV. SUMMARY JUDGMENT ON PENALTIES IS TIED TO SUCCESS ON THE MERITS. ......... 38

**CONCLUSION** ..................................................................................................... **38**

## TABLE OF AUTHORITIES

**Cases**

*Alpha I, L.P. v. United States*, 93 Fed. Cl. 280 (2010)........ 15
*AMERCO, Inc. v. Commissioner*, 979 F.2d 162 (9th Cir. 1992)........ 7
*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)........ 15, 36
*Avrahami v. Comm'r*, 149 T.C. 144 (2017)........ 2, 4
*Black Hills Corp v. Comm'r*, 101 T.C. 173 (1993)........ 10
*Caylor Land & Dev., Inc. v. Comm'r*, T.C. Memo. 2021-30........ 4, 6, 8, 14
*Caylor,* T.C. Memo. 2021........ 21
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)........ 4, 27, 29
*CFM Ins. v. Comm'r*, T.C. Memo. 2025-83........ 8
*Cheung v. United States*, 146 Fed. Cl. 369 (2019)........ 15, 38
*Clougherty Packing Co. v. Comm'r*, 811 F.2d 1300 (9th Cir. 1987)........ 10, 11, 20, 21
*Cook v. United States*, 46 Fed. Cl. 110 (2000)........ 36
*Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512 (5th Cir. 2012)........ 35
*EFC Servs., Inc. v. United States*, 172 Fed. Cl. 694 (2024)........ 15, 37
*Gulf Oil Corp. v. Commissioner*, 89 T.C. 1010 (1987), *rev'd in part on other grounds*, 914 F.2d 396 (3rd Cir. 1990)........ 16
*Harper Group v. Commissioner,* 96 T.C. 45 (1991), *aff'd*, 979 F.2d 1341 *(9th Cir. 1992)*........ 16, 22
*Helvering v. Le Gierse*, 312 U.S. 531 (1941)........ 2, 9, 10, 20
*Humana Inc. v. Comm'r*, 881 F. 2d 247 (6th Cir. 1989)........ 11
I.R.C. § 6662(d)(2)(C)........ 38
*Jade Trading, LLC v. United States,* 80 Fed. Cl. 11 (2007)*, aff'd in part, vacated in part, rev'd in part sub nom., Jade Trading, LLC ex rel. Ervin v. United States,* 598 F.3d 1372 (Fed. Cir. 2010)........ 14
*Jones v. Comm'r*, T.C. Memo. 2025-25........ 8
*Kadau v. Commissioner of Internal Revenue*, T.C. Memo. 2025-81........ 33
*Karlsson v. Kona Blue Water Farms, LLC*, No. CIV. 07-00242-BMK, 2008 WL 4753340 (D. Haw. Oct. 24, 2008)........ 15
*Keating v. Comm'r*, T.C. Memo. 2024-2........ 8
*Kidde Indus., Inc. v. United States*, 40 Fed. Cl. 42 (1997)........ 11, 12, 17
*Leighton v. United States*, 155 Fed. Cl. 543 (2021)........ 36
*Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 266 F.3d 1358 (Fed. Cir. 2001)........ 36
*Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943)........ 18
*Ocean Drilling & Expl. Co. v. United States*, 988 F.2d 1135 (Fed. Cir. 1993)........ passim
*Ocean Drilling*, 24 Cl. Ct. 714 (1991), *aff'd*, 988 F.2d 1135 (Fed. Cir. 1993)........ 16, 30
*Patel v. Comm'r*, T.C. Memo. 2024-34........ 8, 22, 27
*R.V.I. Guar. Co. & Subsidiaries v. Comm'r,* 145 T.C. 209 (2015)........ 11, 16, 20, 22
*Rent-A-Center, Inc. v Comm'r*, 142 T.C. 1 (2014)........ 11, 20, 21, 22
*Reserve Mech. Corp. v. Comm'r*, T.C. Memo. 2018-86, aff'd, 34 F.4th 881 (10th Cir. 2022)........ passim

*Royalty Mgmt. Ins. v. Comm'r*, T.C. Memo. 2024-87 .... 8, 10, 16, 19
*Rsrv. Mech. Corp. v. Comm'r*, 34 F.4th 881 (10th Cir. 2022) .... passim
*Securitas Holdings v. Comm'r*, T.C. Memo. 2014-225 .... 20
*Smith v. Hughes Aircraft Co.,* 22 F.3d 1432 (9th Cir. 1993) .... 15
*Steere Tank Line Inc. v. United States*, 577 F.2d 279 (5th Cir. 1978) .... 16, 19
*Swift v. Comm'r of Internal Revenue*, 144 F.4th 756 (5th Cir. 2025) .... 12
*Swift v. Comm'r*, T.C. Memo. 2021-13, *aff'd*, 144 F.4th 756 (5th Cir. 2025) .... passim
*Syzygy Ins. Co. v. Comm'r*, T.C. Memo 2019-34 .... 4, 8, 14, 16
*TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151 (Fed. Cir. 2004) .... 36

**Statutes**

I.R.C. § 162 .... 5, 6, 10
I.R.C. § 501(c)(15) .... 9
I.R.C. § 831(b) .... 9, 10
I.R.C. § 953(d) .... 9
I.R.C. § 1411 .... 9
I.R.C. § 6662(d)(2)(C) .... 42

**Rules**

RCFC 56(c)(1)(A) .... 7

**Regulations**

Treas. Reg. § 1.162-1(a) .... 10

**UNITED STATES COURT OF FEDERAL CLAIMS**

---

**No. 21-913 T**
**(Judge Kathryn C. Davis)**

**CAPSTONE ASSOCIATED SERVICES, LTD., by and through CAPSTONE HOLDING CORP., Tax Matters Partner,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

## THE UNITED STATES' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant, the United States, submits its Response in Opposition to Plaintiff's Motion for Summary Judgment in this case, along with its Response to Plaintiff's Statement of Undisputed Facts ("ECF No. 187-1, SOF Resp.") and the exhibits thereto.

## INTRODUCTION

Plaintiff, a TEFRA partnership, has brought suit in this Court asserting its right to claim certain deductions under I.R.C. § 162 related to its use of a micro-captive arrangement that it alleges it used to effectively self-insure[1] against

[1] We use the terms "insurance," "risk," "coverage," and similar terms to describe the form of the transactions, but our use of those terms does not reflect any substantive

(continued...)

purported risks that are allegedly uninsurable or unavailable on the commercial market.[2] To determine whether payments made into a micro-captive arrangement constitute bona fide insurance and are therefore deductible business expenses under § 162, the Court must engage in a facts-and-circumstances analysis that considers whether plaintiff has established each of four key criteria: (1) the existence of an insurable risk; (2) risk shifting; (3) risk distribution; and (4) the hallmarks of commonly accepted notions of insurance. *See, e.g., Helvering v. Le Gierse*, 312 U.S. 531, 539-40 (1941); *Ocean Drilling & Expl. Co. v. United States*, 988 F.2d 1135, 1151 (Fed. Cir. 1993) (considering transfer and distribution and using "presence of insurance risk" and "commonly accepted notions of insurance," as relied on in Tax Court cases, to determine if the separate status of insurer from insured was "a sham"); *Rsrv. Mech. Corp. v. Comm'r*, 34 F.4th 881, 904 (10th Cir. 2022) (Tax Court's four-part test "capture[s] the essence of the statutory requirement"); *Avrahami v. Comm'r*, 149 T.C. 144; 190-91 (2017).

This analysis is *highly factual*. Over years of contentious discovery, the government has assembled a wealth of information that is extensive and complex, meriting trial (including expert testimony) to illustrate fully the facts and circumstances of Capstone's particular micro-captive arrangement. And while

---

characterization as a matter of fact or law about insurance or insurance companies under subchapter L of the Code.

[2] Plaintiff challenges the adjustments in the FPAA, a question subject to de novo review by this Court. *Jade Trading LLC v. United States*, 80 Fed. Cl. 11, 43 (2007), aff'd in part, vacated in part, rev'd in part sub nom., *Jade Trading, LLC ex rel. Ervin v. United States*, 598 F.3d 1372 (Fed. Cir. 2010).

plaintiff still has failed to produce all information needed to prove its case, when the full universe is before the Court, the facts and circumstances will show that plaintiff has created exactly the kind of abusive micro-captive that the law prohibits. And, as the government's response to plaintiff's proposed statement of undisputed facts demonstrates, the wide array of disputed facts makes it impossible for the Court to resolve those questions in a summary judgment motion brought by the party with the burden of proof, both as plaintiff and movant.

Plaintiff attempts to avoid this scrutiny, as it has since the outset of the case, by filing a motion for summary judgment that (1) misstates the law; (2) gives improper weight to IRS actions in a *de novo* proceeding; and (3) relies on conclusory assertions that are plagued by questions of materiality, admissibility, and disputability, especially given the *de novo* standard. Stripping plaintiff's facts to their essentials makes clear that the motion reasserts the same grounds raised in their October 2021 motion for summary judgment (ECF 22), filed the day the parties' JPSR was due. But plaintiff's surface-level facts still fail to address the outstanding questions that would allow the Court to determine whether plaintiff purchased bona fide insurance.

Even if plaintiff's assertions imply their micro-captive arrangement exists on paper, plaintiff has not demonstrated, on the undisputed material facts, that it has purchased bona fide insurance that entitles it to the sought-after tax benefits. On the record plaintiff offers now, it cannot demonstrate, as RCFC 56(c)(1)(A) requires that the material facts "cannot be or [are not] generally disputed." Under such

circumstances, trial, not summary judgment, is the appropriate resolution. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## I. Micro-captives: An overview.

The abusive transaction at issue is called "micro-captive transaction." As described more fully below, the micro-captive arrangement involves, at a high level, a complex, pre-planned, series of transactions designed to avoid a tax liability through fictitious insurance policies, which have no economic effect other than to create tax deductions. Micro-captive transactions typically contort the tax laws to the benefit of wealthy taxpayers and have been struck down in the Tax Court. *See Avrahami v. Comm'r*, 149 T.C. 144 (2017); *Syzygy Ins. Co. v. Comm'r*, T.C. Memo 2019-34, *Reserve Mech. Corp. v. Comm'r*, T.C. Memo. 2018-86, aff'd, 34 F.4th 881 (10th Cir. 2022); *Caylor Land & Dev., Inc. v. Comm'r*, T.C. Memo. 2021-30. While the petitioners in those cases simply bought the micro-captive transactions at issue, here, Capstone is the creator, the administrator, and the client of the very micro-captive transaction it engaged in. In other words, Capstone not only purchased the micro-captive arrangement at issue, but it also created and administered it, along with every other captive in their pooling company, PoolRe.

### A. Micro-captives, defined.

Typically, a micro-captive transaction involves a small, non-life insurance company that provides coverage to a related party (*i.e.*, an entity under the same ownership), rather than the related party deciding to self-insure or seek commercial coverage. Outside of the micro-captive arrangement described here, nonlife insurance companies with very small gross receipts and meeting certain premium

percentage requirements were exempt from tax under I.R.C. § 501(c)(15).[3] *Avrahami*, 149 T.C. at 176.

For insurance companies with greater receipts or that do not meet the other § 501(c)(15) requirements, deductions are not available for self-insurance—that is, when a company sets aside loss reserves to pay its own claims, based on an estimate of amounts that it might have to pay, rather than taking out an insurance policy. *Avrahami*, 149 T.C. at 174. And when the company invests those loss reserves (rather than having them sit idle in a bank account), it pays tax on the investment income. I.R.C. § 1411. At the same time, insurance companies are generally taxed on the premiums they receive. *Avrahami*, 149 T.C. at 174-75.

Under the Internal Revenue Code, however, micro-captive insurance companies may make an election under I.R.C. § 831(b) that (in 2016, the year at issue), allowed them to exclude up to $1.2 million per year in premiums from taxable income, thus paying tax only on investment earnings at corporate income

[3] Companies elect § 501(c)(15) status using IRS Form 1024. In addition to that election, certain insurance companies domiciled outside of the United States may submit an election under I.R.C. § 953(d) to be subject to United States federal income tax (including exemptions) as if they were United States-based insurance companies. In *Reserve Mechanical*, the Tax Court determined that another Capstone-managed entity was not exempt under § 501(c)(15) because it was not a bona fide insurance company under the Code and therefore also was not eligible to make an election under § 953(d). *Rsrv. Mech. Corp.*, T.C. Memo 2018-86 at *22, *aff'd*, 34 F.4th 881 (10th Cir. 2022). The legal test applied is identical to that used to determine if an arrangement qualifies as an insurance company for purposes of § 831(b). *Compare id. with Avrahami*, 149 T.C. at 176.

tax rates.[4] Taxpayers routinely claim that premium payments to such captive "insurers" represent "ordinary and necessary" trade or business expenses, which they then claim as deductions. *See* I.R.C. § 162(a); Treas. Reg. § 1.162-1(a).

There is a heightened opportunity for abuse any time a taxpayer can enjoy a tax loss without having to suffer a corresponding economic loss. *Cf. Kerman v. Comm'r*, 713 F.3d 849, 864-65 (6th Cir. 2013), *cert. denied*, 571 U.S. 1126 (2014) ("[S]ham transactions are characterized by artificial losses that have only upsides—they appear on the tax return, but not the profit and loss statement."). But captive insurance carries a particular risk of abuse because the captive and the insured are related, and generally closely held, entities. *Caylor*, T.C. Memo. 2021-30 at *10 (2021). The parent can "pay" premiums to the captive and obtain a *tax* benefit without losing the *economic* benefit of the funds. *See Avrahami*, 149 T.C. at 179; *Rsrv. Mech.. v. Comm'r*, 34 F.4th 881, 885 (10th Cir. 2022).

By way of (oversimplified) illustration: Company A owns a separate but related Company B, used to insure the risks of Company A (and, possibly, related entities). When Company A pays "insurance premiums" to Company B, Company A can take a § 162 business-expense deduction for the payments, and if Company B makes an § 831(b) election, those payments are excluded from taxable income.

The result is that neither company pays immediate tax on the would-be

[4] Even large insurance companies only pay tax on the profit they derive from premiums. Congress enacted § 831(b) as part of the Tax Reform Act of 1986, AR 1429–30, to simplify the taxation of small insurance companies. *Id.* at 5657. Under § 831(b), instead of being taxed on 10% of premium income, an insurance company pays no tax at all. I.R.C. §§ 831, 832**.**

income: Company A instead takes a deduction, thereby off-setting income, and Company B incurs no taxable income because, definitionally, it receives the captive exclusion. In addition, and where the potential for abuse arises, Company B may then return the economic benefit of the premium income to Company A, either through a loan, a dividend (taxed at a lower rate), or by using the income for Company A's benefit, such as by purchasing property to be used by Company A (or any combination of these and other options).

In other words, if Company A paid $2 million to GEICO, for instance, it might enjoy a $2 million § 162(a) deduction. That tax deduction is less valuable than the two million actual dollars that went out the door. If Company A used a micro-captive, in contrast, that $2 million might move from Company A to Company B, and then immediately back to Company A as a loan (for example, as mortgage to Company A's owner, or to lend funds to another entity owned by the same insured). *Avrahami*, 149 T.C. at 179.

**B. Micro-captives have unique potential for abuse.**

Captive insurance carries a particular risk of abuse because the captive and the insured are related, and generally closely held, entities—the relationship is not arm's-length.[5] The line between micro-captive insurance (a double windfall, thanks

[5] Conventional insurance arrangements, by contrast, occur through the commercial marketplace, where the insurer and the insured are unrelated parties negotiating at arm's length, and the insured has no interest in, or control over, the premiums after remitting them to the insurer."'[F]rom the standpoint of the insured there can be no profit from'" the risk covered by the insurance. *AMERCO, Inc. v. Comm'r*, 979 F.2d 162, 167 (9th Cir. 1992).

to deduction and exemption) and self-insurance (no deduction and no exemption) becomes blurry. This creates a perverse incentive to increase premiums beyond what actuarial science and economic reality would suggest is reasonable—every dollar paid in premiums to the insurer (Company B) is essentially tax free but available for the insured (*i.e.*, Company A) to use for its benefit, given that the latter owns the former. *See Avrahami*, 149 T.C. at 179; *Reserve Mech. Corp.*, 34 F.4th at 885. In addition, the ownership structure allows the insurer (Company B) to structure its arrangement to (1) minimize risks (and thus the likelihood of claims payments, *i.e.,* losses) and (2) create risk-sharing pools with minimal potential for claims from any pool member.

Adding additional complexity, the Internal Revenue Code does not clearly define "insurance" for its purposes. *Res. Mech. Corp.*, 34 F.4th at 903. As a result, taxpayers began to structure companies so they could improperly shelter income by claim tax benefits for § 831(b) captive arrangements that fail to provide real insurance.[6]

As the Tax Court noted in *Avrahami*, while a micro-captive like Company B

---

[6] *See, e.g.*, *Avrahami*, 149 T.C. 144 (2017) (AR 31–67) (arrangement failed to distribute risk and did not act as insurer commonly would); *Syzygy Ins. Co. v. Comm'r*, T.C. Memo. 2019-34 (2019) (same) (AR 855–75); *Caylor Land & Dev., Inc. v. Comm'r*, T.C. Memo. 2021-30 (2021) (AR 111–63) (same); *Patel v. Comm'r*, T.C. Memo. 2024-34 (2024) (AR 555–90) (same); *Jones v. Comm'r*, T.C. Memo. 2025-25 (2025) (same); *Keating v. Comm'r*, T.C. Memo. 2024-2 (2024) (AR 405–51) (not insurance in commonly accepted sense); *Royalty Mgmt. Ins. v. Comm'r*, T.C. Memo. 2024-87 (2024), *appeal dismissed*, (10th Cir. Jan. 10, 2025) (AR 736–68) (same); *Swift v. Comm'r*, T.C. Memo. 2021-13 (2024) (AR 823–54), *aff'd*, 144 F.4th 756 (5th Cir. 2025) (same); *Kadau v. Comm'r*, T.C. Memo. 2025-81 (2025) (same); *CFM Ins. v. Comm'r*, T.C. Memo. 2025-83 (2025) (same).

might be run legitimately, "it might also be run so that related parties pay the captive deductible insurance premiums of just under $1.2 million a year. In turn the captive might pay out few if any claims, . . . [pay] tax only on its investment income, and . . . quickly build up a large surplus[.]" *Avrahami*, 149 T.C. at 179–80. That surplus, in turn might be lent to the insurers "affiliates" or doled out in "large dividend payments to its stockholder" in a tax-sheltered IRA. *Id.* Or, if the micro-captive were owned, say, "by its business owner's children or an irrevocable family trust," the amassed surplus might be a way to avoid "future gift and estate taxes." *Id.* Regardless which of these or "other variations on th[e] theme" are used, in the end, the arrangement results in $1.2 million in tax deductions "while arguably only moving money from one pocket to another." *Id.* ("[T]he Commissioner . . . finds none of [these variations] pleasing.")

**C. Legal landscape: challenging abusive micro-captives.**

Given the risk of abusive micro-captive arrangements, the IRS began auditing such transactions. Taxpayers, in turn, have brought challenges to IRS determinations. In every case decided to-date, the Tax Court found that the micro-captive "insurance" arrangements claimed significant tax benefits that were not allowable because the arrangements were not insurance. [7]

These cases build on the foundation that insurance, under the Revenue Code, required two things: risk transfer (also called risk shifting) and risk distribution. *Helvering v. Le Gierse*, 312 U.S. 531, 539-40 (1941). Over time, the accepted test for

[7] *See* supra, n.6.

determining whether captive insurance (both generally and as to micro-captive arrangements specifically) constitutes bona fide insurance has distilled into four criteria:

- The arrangement involves insurable risks;
- The arrangement shifts the risk of loss to the insurer;
- The insurer distributes the risk among its policy holders; and,
- The arrangement is insurance in the commonly accepted sense.

*Rsrv. Mech. Corp.*, 34 F.4th at 904 (internal quotations remove, but quoting *Rsrv. Mech., T.C. Memo. 2018-8*at 14.[8] By way of deeper explanation:

**Insurable risks:** An insurable risk is a "loss-producing hazard." *Black Hills Corp v. Comm'r*, 101 T.C. 173, 182 (1993). In other words, the insurer accepts premiums "as consideration for agreeing to perform some act if and when that hazard occurs." *Id.* This is not a mere "investment risk." *Id.*

**Risk shifting:** "Risk shifting," also called "risk transfer," occurs when the potential loss from an identifiable risk is removed from the insured to the insurer, such that the insured's loss does not affect it because the loss is offset by the payment the insured receives from its insurer. *Clougherty Packing Co. v. Comm'r*, 811 F.2d 1297, 1300 (9th Cir. 1987); *see also Humana Inc. v. Comm'r*, 881 F. 2d 247,

[8] This is the test that Plaintiff proposed in its first Motion for Summary Judgment. *See* ECF 23 at 11-17 and its position in the Joint Preliminary Status Report. ECF 33 at 3. ("Plaintiff alleges that the only issues that the Court must determine in this case are these four issues discussed in further detail below. Long established case law has established that an insurance arrangement constitutes insurance for tax purposes if it (1) involves insurable risk, (2) shifts the insured's risk of loss to the insurer, (3) distributes risk among the insurer's policy holders, and (4) meets commonly accepted notions of insurance. *Helvering v. Le Gierse*, 312 U.S. 531, 539 (1941)." Plaintiff has since abandoned this view for the more simplistic form-driven analysis it incorrectly claims is supported by *Ocean Drilling*, 988 F.2d at 1150.

251 (6th Cir. 1989). *Rent-A-Center, Inc. v Comm'r*, 142 T.C. 1, 16 (2014). That transfer of risk occurs when the insured "pays the insurer a premium" *R.V.I. Guar. Co. & Subsidiaries v. Comm'r,* 145 T.C. 209, 25 (2015). To determine if risk is shifted, courts consider "the economic consequences" of the arrangement on the insured party to see if "a covered loss affects the balance sheet and net worth of the insured." *Rent-A-Center*, 142 T.C. at 16. In other words, "when risks faced by the parent become the responsibility of a wholly owned subsidiary, and the subsidiary in turn combines those risks with other independent risks of corporations unrelated to the parent, the net effect is that the parent will shoulder less risk because it has a lower variability of loss than it faced before it entered the arrangement with its subsidiary." *Kidde Indus., Inc. v. United States*, 40 Fed. Cl. 42, 57 (1997).

**Risk distribution:** "Risk distribution" occurs "when the insurer pools a large enough collection of unrelated risks." *Avrahami*, 149 T.C. at 181. In other words, the insurer has "reduce[d] the possibility that a single costly claim will exceed the amount taken in as a premium and set aside for the payment of such a claim." *Clougherty Packing*, 811 F.2d at 1300. From the insurer's perspective insurance is a risk-distribution device, a mechanism by which the insurer pools multiple independent risks of multiple insureds to take advantage of the "law of large numbers." *R.V.I.,* 145 T.C. at 228. Under the law of large numbers, having a sufficiently large risk pool smooths an insurer's losses so that they better match income from premiums. *Clougherty Packing*, 811 F.2d at 1300. This, it is much less likely that one big claim could outstrip the total premiums received. *Id.*

**Commonly accepted notions of insurance:** In considering commonly accepted notions of insurance, courts consider factors such as "[1] whether the company was organized, operated, and regulated as an insurance company; [2] whether it was adequately capitalized; [3] whether the policies were valid and binding; [4] whether the premiums were reasonable and the result of an arm's-length transaction; and [5] whether claims were paid." *Rsrv. Mech.*, 34 F.4th at 907; *see also, e.g., Ocean Drilling*, 988 F.2d at 1151 (listing factors); *Swift v. Comm'r of Internal Revenue*, 144 F.4th 756, 768–69 (5th Cir. 2025) (dicta).

* * *

Plaintiff' prefers to rely on *Ocean Drilling,* 988 F.2d at 1149, but the test is no different.[9] In adherence to *Le Gierse*, the court considers "whether the transactions between the two companies resulted in risk shifting and risk distributing." *Id.* Consistent with Tax Court rulings, the *Ocean Drilling* court also considers whether "presence of insurance risk" (*i.e.*, the insurable risk requirement), and "commonly accepted notions of insurance" mean that the insurance company was a "sham," such that the insured and its insurance company were not considered separate entities. *Id.* at 1150; *see also Kidde Indus.*, 40 Fed. Cl. at 50 (part of the sham analysis is whether the arrangement comports with commonly accepted notions of

[9] *Ocean Drilling* was decided in 1993 and involved tax years 1974 and 1975, which predates § 831(b)'s addition to the Code but not the general test for whether an arrangement constitutes insurance. 988 F.2d at 1140; *Avrahami*, 149 T.C. at 175. The tax year at issue here (2016)—and in the recent series of decisions (*supra*, n.6)—post-date the addition of § 831(b), *Avrahami,* 149 T.C. at 175-76, but the test for "insurance" remains consistently defined. *Compare Ocean Drilling*, 988 F.2d at 150 *with Avrahami*, 149 T.C. at 176-77.

insurance). Plaintiff characterizes this as a "sham analysis," ECF 181 at 3-4, but the issues are the same. *See Ocean Drilling*, 988 F.2d at 1151 (considering insurable risks, nature of contracts, basis for premiums, claims processing, commingling of funds and business operations, and adequacy of capitalization). Considerations that favored upholding the corporate form in that case included clear payment for coverage, employees (including underwrites) that worked for the insurer, "loaning to or commingling funds" with the insured, reputable investments that followed guidelines set by the insurer's board, premiums shown to be derived directly from commercial rates, and a well-documented need for the insurance given changes in commercial market conditions. *Id.* at 1138-1144.

The legal test for insurance, in other words, takes into consideration not just whether the policies are for actual hazards, but also the nature of the relationship between insured and insurer and how closely it resembles a true arm's-length relationship. Facts material to this analysis include the nature of the insureds, the number and type of policies as well as the reasons for including them; whether the reinsurer was a bona fide insurance company (requiring the same intensive analysis of that company); a detailed examination of the flow of funds and whether it was circular; whether premiums were excessive considering their methodology and underlying motivation; the insurer's capitalization and staffing; the arm's-length nature of the arrangement; the fee structure; the probability a claim would be brought; whether the insurer operated as an insurance company; whether policies were unclear and contradictory; the process for making a claim; and whether and

how often claims were paid. *Compare Ocean Drilling,* 988 F.2d at 1151 *with Avrahami,* 149 T.C. at 145*; Syzygy Ins. Co.,* T.C. Memo 2019-34 at *13*, Rsrv. Mech..,* T.C. Memo. 2018-86*; Caylor,* T.C. Memo. 2021-30.

To circumvent trial, plaintiff must lift a heavy burden: it must prove that the substance of the transaction matches the form based on the undisputed material facts. *Jade Trading, LLC v. United States,* 80 Fed. Cl. 11, 13–14 (2007)*, aff'd in part, vacated in part, rev'd in part sub nom., Jade Trading, LLC ex rel. Ervin v. United States,* 598 F.3d 1372 (Fed. Cir. 2010) ("the taxpayer has the burden of proving that the transaction which gave rise to the tax benefit objectively had economic substance, *i.e*., was a real transaction structured in a particular way to provide a tax benefit as opposed to a transaction created for tax avoidance purposes."). It has not done so, as the United States demonstrates below.

## II. Summary judgment is not the vehicle to resolve genuine disputes and questions of credibility.

To reiterate: determining whether any micro-captive constitutes bona fide insurance under the Internal Revenue Code is a complex undertaking. And it is not, no matter how plaintiff may wish, a question of law such that only the forms of the documents matter or that conflicting expert opinions do not create credibility issues. ECF 181 at 23.

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242at,

247–48 (1986). A dispute is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.* And evidence need not be in a form that would be admissible at trial for the Court to consider it at the summary judgment stage. *Alpha I, L.P. v. United States*, 93 Fed. Cl. 280, 293 (2010) (citing *Celotex*, 477 U.S. at 324).

Resolving questions around the importance, significance, or truth of a fact in a complex record requires credibility determinations, and that is a question for trial. *EFC Servs., Inc. v. United States*, 172 Fed. Cl. 694, 700 (2024) (citing *Cheung v. United States*, 146 Fed. Cl. 369, 379 (2019)). This rule is true for expert as well as fact witnesses. *See Smith v. Hughes Aircraft Co.,* 22 F.3d 1432, 1441 (9th Cir. 1993) ("the district court's conclusion that [one party's] experts were less credible is inappropriate at summary judgment."); *see also Karlsson v. Kona Blue Water Farms, LLC*, No. CIV. 07-00242-BMK, 2008 WL 4753340, at *3 (D. Haw. Oct. 24, 2008) ("It is for the trier of fact to determine the credibility and weight to be given to testimony, expert or otherwise, and where such a determination is required, summary judgment is inappropriate.").

Recent Tax Court cases bear this out. Multiple micro-captive cases dealing with questions to those here have gone to trial and involved testimony from multiple expert witnesses.[10] *See generally, e.g., Avrahami,* 149 T.C. 144 (2017);

---

[10] Plaintiff has been reticent as to the implications of one such case, which involved both Capstone and PoolRe, albeit for different tax years and lacking FinServ. *Res. Mech. Corp. v. Comm'r*, 34 F.4th 881 (10th Cir. 2022). That case was resolved based on facts noticeably absent from plaintiff's Statement of Undisputed Facts in this case. *Id.*

*Syzygy*, T.C. Memo 2019-34; *Swift,* T.C. Memo. 2024-13, aff'd, 144 F.4th 756 (5th Cir. 2025). The same is appropriate here, where disputed facts regarding, among other things, risk shifting, risk distribution, and common notions of insurance are rife. The parties have collectively identified seven experts who are expected to testify at trial.

**A. FinServ lacks the unrelated risks required for risk-shifting.**

For true risk shifting to occur, the insurer must be "a well-capitalized company fully capable of paying claims and absorbing the risks transferred to it." *R.V.I. Guar. Co. v. Comm'r,* 145 T.C. 209, 225–26 (2015) (citing *Harper Group v. Comm'r,* 96 T.C. 45, 57 (1991), *aff'd*, 979 F.2d 1341 *(9th Cir. 1992)* (finding risk transfer where the insurer "not only was financially capable of satisfying claims made against it, but in fact paid such claims"). True risk transfer requires that the insured be reimbursed in all realistic loss scenarios, including those in which its claims exceed the premiums paid. *Royalty Mgmt. Ins.*, T.C. Memo. 2024-87, at *37-38; *see also Steere Tank Line Inc. v. United States*, 577 F.2d 279, 280 (5th Cir. 1978) (finding no risk transfer where claims would only be paid up to the amount of premiums). If the insured has shifted its risk to the insurer, then a loss by or a claim against the insured does not affect it because the loss is offset by the proceeds of an insurance payment. *Gulf Oil Corp. v. Comm'r*, 89 T.C. 1010, 1036 (1987), *rev'd in part on other grounds*, 914 F.2d 396 (3rd Cir. 1990).

In a parent-subsidiary arrangement, risk can be transferred if the subsidiary engages in sufficient unrelated business. *See Ocean Drilling*, 24 Cl. Ct. 714, 730 (1991) (44 percent to 66 percent from others), *aff'd*, 988 F.2d 1135 (Fed. Cir. 1993).

As indicia thereof, the *Ocean Drilling* court considered that Mentor (the insurer) "was effectively regulated by the insurance industry itself." *Ocean Drilling,* 988 F.2d at 1153. "Unrelated parties would reinsure and co-insure with Mentor only if they viewed Mentor as financially sound, since they would be liable if Mentor was unable to meet its obligations. Thus, Mentor was required to maintain financial stability if it desired to undertake business with unrelated parties." *Id.* In other words, *if* "unrelated business operates to reduce the amount of risk to which plaintiff is exposed," then risk shifting occurs. *Id.* at 1152.

A genuine dispute exists in this case as to whether FinServ, Capstone, and the other Feldman-Matz "affiliated business interests" co-named on FinServ's policies are correctly considered unrelated businesses. FinServ and Capstone Associated Services, Ltd. have the same beneficial owners, Stewart Feldman and Marla Matz, as do the twelve named insureds (including Capstone) on FinServ's ten policies. SOF Resp. ¶¶ 4, 44, 46, 82, 108, 114, 125, 133. Thus, the direct written policies issued by FinServ did not shift risk because the policies were held by a limited number of entities related to FinServ and Capstone. *Cf. Kidde Industries, Inc*., 40 Fed. Cl. 42 (upholding deductions paid to captive insurer where the taxpayer was a broad-based decentralized conglomerate with 15 separate operating divisions and 100 wholly owned operating subsidiaries for which it needed workers' compensation, automobile and general liability coverage.).

If the above facts are true, then when Capstone paid premiums, it took money from the affiliated group's right pocket and placed it in its left pocket.

Similarly, to the extent that FinServ paid *out* any claims, Capstone was merely transferring the money back to its right pocket which would be used to cover any losses. However, that payment would reduce the overall amount of cash available to Capstone and the affiliated group. *Id.*

Plaintiff misconstrues *Ocean Drilling* to suggest that because FinServ, on paper, was a "separate entity," the commonly owned, named insureds on FinServ's ten policies should *be* considered unrelated, simply because they are "sibling insureds." In support, plaintiff misstates the role of *Moline Properties* to the *Ocean Drilling* analysis, asserting that the Court is "require[d]" to treat Capstone and its corporate siblings as separate entities. SOF ¶¶ 43.

Not so: under *Moline* and *Ocean Drilling,* corporate siblings should be treated as separate entities if they are not a shaAm—if they are a sham, corporate form should be disregarded. This is the *very* point of the analysis the Court undertakes in *Ocean Drilling*, relying on indicia of insurable risk and commonly accepted notions of insurance. *Ocean Drilling*, 988 F.2d at 1150-51 (quoting *Moline Properties, Inc. v. Comm'r,* 319 U.S. 436, 438–39 (1943)). Because, as described below, *infra* at pp. 33-39, Capstone fails plaintiff's "sham" test by failing to meet commonly accepted indicia of insurance, these sibling relationships convert to related risks, and no transfer occurs.

Here, the information available creates a dispute as to whether FinServ engaged in asserted reinsurance and co-insurance activities with PoolRe. SOF Resp., ¶¶ 4, 44, 46, 82, 108, 114, 125, 133. That entity, too has substantial financial

interrelationships with FinServ. Among other things, FinServ held 100% of PoolRe's pledged stock, and board minutes identify PoolRe as a "wholly owned subsidiary" of Capstone. SOF Resp. ¶44. In addition, all of PoolRe's quota share and stop loss arrangements were with other Capstone-managed insurers. *See, e.g.,* SOF Resp. ¶ 44 (as to FinServ); *see e.g., id.* ¶¶ 128, 107 (as to PoolRe). *See, e.g.,* SOF Resp. ¶¶ 64-5, 71. Thus, "any expense of [FinServ], such as payment of a claim [to any of the nine affiliated entities], would reduce the assets" of Capstone. *Ocean Drilling & Expl. Co. v. United States*, 988 F.2d 1135, 1152 (Fed. Cir. 1993). Assuming these facts are true, the PoolRe arrangements also do not constitute unrelated risk.

Even if one were to assume the undisputed facts demonstrate that PoolRe is a legitimate insurance company, true risk transfer also requires that the insured be reimbursed in all realistic loss scenarios, including those in which claims exceed the premiums paid. *Royalty Mgmt. Ins.*, T.C. Memo 2024-87, at *37. Here, FinServ purportedly participated in a risk pooling arrangement by purchasing reinsurance policies from PoolRe. SOF Resp. ¶¶ 48, 51-52. In 2016, PoolRe's negligible losses and improperly high premiums create a genuine dispute over whether the arrangement with PoolRe actually transferred risk through its pooling. *See infra* at 27; *see also Ocean Drilling,* 988 F.2d at 1152 ("If the level of risk plaintiff initially had transferred and the level of risk plaintiff ultimately had shouldered were virtually the same, plaintiff's risk effectively would not have transferred."). *See also Steere Tank Line Inc.*, 577 F.2d at 280. The information available suggests that

each participating captive only risked their investment in the pool and did not assume any risk from other captives participating in the pool. Thus, even assuming that PoolRe was a legitimate insurance company, FinServ did not shift any risk to it.

### B. None of FinServ's alleged risk distribution strategies achieve their goals.

The concept of risk transfer is fundamentally linked to that of risk distribution. *See Helvering,* 312 U.S. at 539. "From the insurer's perspective, insurance is a risk-distribution device, that is, a mechanism by which the insurer pools multiple risks of multiple insureds in order to take advantage of 'the law of large numbers.'" *R.V.I. Guar. Co.,* 145 T.C. at 228. Generally, risk distribution occurs when the insurer pools a sufficiently large collection of risks that are completely unrelated or are otherwise independent of each other. *See Rent-A-Center*, 142 T.C. at 24. Risks are independent when "the likelihood of a loss under one policy is independent of the likelihood of a loss under a separate policy." *Rsrv. Mech. Corp.*, 34 F.4th at 904 (citing *Clougherty Packing Co.,* 811 F.2d at 1300); *see also Avrahami*, 149 T.C. at 181; *Swift*, T.C. Memo. 2024-13, at *17 ("Micro-captive insurers have not fared as well with respect to showing risk distribution; all of our previous cases have found compliance with this requirement lacking.").

The "law of large numbers" posits that "the average of a large number of independent losses will be close to the expected loss." *Avrahami*, 149 T.C. at 181; *see Rsrv. Mech. Corp.*, 34 F.4th at 904; *R.V.I.*, 145 T.C. at 228; *Securitas Holdings*, T.C. Memo. 2014-225, at *25-26. "By assuming numerous relatively small, independent

risks that occur randomly over time, the insurer smooths out losses to match more closely its receipt of premiums." *Rent-A-Center*, 142 T.C. at 24 (quoting *Clougherty Packing Co. v. Comm'r*, 811 F.2d at 1300). Distributing risk "allows the insurer to reduce the possibility that a single costly claim will exceed the amount taken in as a premium." *Securitas Holdings Inc.*, T.C. Memo. 2014-225 at *25 (quoting *Clougherty Packing Co.*, 811 F.2d at 1300).

In prior micro-captive insurance cases, taxpayers have unsuccessfully argued that their wholly-owned insurer created risk distribution in one or more ways, including: (1) issuing direct written policies to affiliate entities with a large enough pool of unrelated risks, (2) participating in a pooling arrangement whereby the pool performs the functions of an insurance company; and (3) using co-insurance arrangements. *Swift*, T.C. Memo. 2024-13, at *16-19; *Rsrv. Mech.*., T.C. Memo. 2018-86 at 46-47. Plaintiff makes the same three arguments, relying on its own nine policies, a quota share arrangement with PoolRe, and its reinsurance, via an intermediary, of a tiny fraction of a larger company's vehicle service insurance contracts. ECF 181 at 43. Again, the information acquired in discovery manifests genuine factual disputes as to whether any of the above mechanisms actually distribute risk, despite plaintiff's assertion that the form suffices to prove substance.

**1. FinServ's own policies are not spread among unrelated risks.**

Micro-captives also have often argued (again, unsuccessfully) that they meet the risk-distribution requirement by issuing policies to their own brother and sister entities. *Caylor,* T.C. Memo. 2021 at *10-12. The key question in such cases became

whether there was a large enough pool of unrelated risk. *Id.* The answer to this question does not hinge solely on "the number of brother-sister entities insured, but [on] the number of independent risk exposures." *Id.* at *34.

In *Caylor Land & Development, Inc.*, the Tax Court decided that a micro-captive did not distribute risk when there were zero risks from an unrelated party, with all risks in the same geographic area. *Id.* at *38-39. The case law identifies no magic number for an acceptable quantity of risk, but considers, among other things, the number of policies issued, the number of insured entities, and the number of independent exposures (for example, each truck in a fleet). *See Patel v. Comm'r*, T.C. Memo. 2024-34 at *23 (policies issued to three entities insufficient); *Avaramhi*, 149 T.C. at 184 (finding that the issuance of seven different policies to four related entities was insufficient); *Rsrv. Mech.*, T.C. Memo. 2018-86, at *35–36, (finding issuance of eleven and thirteen policies to three insureds was insufficient); *Swift*, T.C. Memo. 2024-13, at *17 (finding issuing six to nine lines of coverage to two to three entities was insufficient). *Cf. Harper Grp.*, 96 T.C. 45 at*51 (finding policies covering 7,500 customers, 30,000 different shipments, and 6,722 special cargo policies were sufficient risk exposure); *Rent-A-Center*, 142 T.C. at *24 (sufficient risk exposure where captive insured three types of risks, 14,000 employees, 7,000 vehicles, and 2,600 stores); *R.V.I. Guaranty*, 145 T.C. 209 at *228-29 (sufficient risk distribution where insurance company insured one type of risk but issued 951 policies to 714 different insured parties and their 754,000 passenger vehicles, over 2,000 real-estate properties, and 1.3 million commercial equipment assets).

Here, FinServ issued nine policies to twelve affiliated entities (*i.e.,* entities owned by Feldman and Matz). SOF Resp. ¶ 85. All twelve were "located" in Houston, Texas—some in the same office building, sharing (or contracting out to) the same employees. *See, e.g.,* SOF Resp. ¶¶ 46, 48, 108. All of these entities, described as "affiliated business interests," SOF Resp. ¶¶ 44, 82, 90, 113, 137, 140-41, 144, 148, 150, 154, & 170, represented economic interests of Feldman and Matz. The lack of unrelated risk, coupled with a shared geographic region and a minimal number of policies insuring a minimal property and employees create a genuine dispute over whether the policies can truly be said to distribute risk. Plaintiff addresses none of this—from its perspective, the mere number of insureds is enough, again relying on a misinterpretation of *Ocean Drilling* for the proposition that Capstone, FinServ, and the other "affiliated business interests" must be treated as separate entities.

### 2. PoolRe's quota share contracts lack multiple indicia of insurance, and so do not distribute risk.

In addition to its own policies, FinServ entered into (on paper), a risk pooling agreement called a quota share agreement, offered by PoolRe, a Capstone-managed entity. SOF Resp. ¶ 115. In determining whether an entity such as a reinsurance pool performs the functions of a bona fide insurance company, courts have considered a number of factors, including (1) whether there was a circular flow of funds; (2) whether the entity faced actual and insurable risk; (3) whether the policies were arm's-length contracts; and (4) whether the entity charged actuarially

determined premiums. *Avrahami*, 149 T.C. at 185; *Syzygy*. T.C. Memo. 2019-34, at *29–30.[11]

Rather than engage with these substantive lines of inquiry plaintiff offers a bare page-and-a-quarter to argue that, in reliance on surface level arithmetic alone, the facts related to risk distribution are undisputed. ECF 181 at 38-9 (asserting distribution is undisputed for either FinServ or PoolRe simply based on the percentage derived by dividing premiums allegedly paid by Capstone by the company's total revenue). But multiple disputes of material facts arise from the information gathered in discovery, and the United States addresses the major areas of dispute in turn.

**3. PoolRe served as vehicle to shift funds to and from captives using a circular cash flow.**

The potential evidence in this case reflects that under its quota share policies, FinServ was to receive reinsurance premiums equal to the direct written premiums that its insureds owed PoolRe under the stop loss endorsements. SOF Resp. ¶ 70. But FinServ never recorded, and it does not contend, that it had any losses or expenses in connection with its purported quota share liabilities. SOF Resp. ¶ 106. Accordingly, the end result for each tax year under the pooling arrangement was that FinServ would receive payments from PoolRe in exactly the

[11] Other areas the courts have considered include (1) whether the entity was created for legitimate nontax reasons; (2) whether the entity faced actual and insurable risk; For the purposes of this motion, the United States focuses on the areas of greatest dispute The United States has also disputed facts pertaining to these elements in its Response to plaintiff's Statement of Material Facts and reserves the right to argue this issue at trial.

same amount as the payments that PoolRe was entitled to receive from Capstone and the other insureds for the stop loss coverage. *See Syzygy*, T.C. Memo. 2019-34, at *30–31 (finding circular flow of funds where retroceded amounts were 96% of premiums paid to reinsurer); *Swift*, T.C. Memo. 2024-13, at *19 (finding circular flow of funds where retroceded amounts were between 95 and 99% of premiums); *Rsrv. Mech.*, T.C. Memo. 2018-86, at *41. For 2016, PoolRe received $28,321,610 in direct written premiums and $11,167,000 in reinsurance assumed from the pooling arrangement while ceding $28,321,610 of the direct written premiums and $11,102,691 of the reinsurance premiums. SOF Resp. ¶ 118. This information creates a genuine dispute as to whether the flow of funds among Capstone, FinServ, and PoolRe operated as the form provided or in substance was used to shift funds among parties to abusively shelter tax in exactly the manner the Tax Court in *Avrahami* deplored: "[w]hile not quite a complete loop, this arrangement looks suspiciously like a circular flow of funds." *Avaramhi*, 149 T.C. at 186.

**C. PoolRe did not face actual and insurable risk.**

To be a bona fide insurance company, PoolRe must have faced a true risk that it would be called to pay out claims. Under the joint stop loss arrangement, PoolRe would not be obliged to pay out a claim under a single policy until the loss exceeded 35% of the premiums on all the policies that were part of the reinsurance program. *See* SOFR Resp. ¶¶ 70, 94. Furthermore, before a claim could be made under the joint stop loss arrangement, the insured first had to exhaust coverage "from any and all other valid insurance policies issued by any insurer" other than PoolRe. *Id.* And even then, PoolRe was obliged to pay 80% of the claim but only to the extent that it

did not exceed 1.6 times the amount of the premiums paid by the insureds. *Id.*

Some information suggests that $1,406,984 was paid in asserted premiums toward claims submitted by captives in 2016. But PoolRe only paid out 2.26% of those premiums—a mere $31,767. Other sources imply that PoolRe paid *no* claims before 2017, and even then paid only $833,562 compared to the $26.1 million in premiums paid by the pool participants. SOF Resp. ¶ 99.

### 1. The quota share policies were not the result of arm's length negotiations.

Generally, a "purchaser of insurance would want the most coverage for the lowest premiums." *Syzygy*, T.C. Memo. 2019-34 at *33. In an arm's-length negotiation, an insurance purchaser would want to negotiate for lower premiums, but as discussed *supra* at XX, microcaptives create a perverse incentive: higher premiums increase the insured's available deduction while still leaving funds available for use. *Id.* at 34. Only if the parties are truly unrelated will captive premiums reflect that they are "effectively regulated by the insurance industry itself." *Ocean Drilling*, 988 F.2d at 1153.

The information available creates genuine doubt about PoolRe's independence. PoolRe's financials establish that it was managed entirely by Capstone and had no employees of its own. SOF Resp. ¶ 118-120. Robert Snyder, one of PoolRe's two directors provided consulting services to Capstone before and during his directorship, and stated "there's no clear line of demarcation, in my mind, between doing work for Capstone and doing work for PoolRe." SOF Resp. ¶ 71, 74, 128, 171. The policies issued by PoolRe were written by Capstone.

SOF Resp. ¶ 120. And to the extent that PoolRe contracted with outside consultants, it did so through Capstone: at deposition, actuaries hired for PoolRe only recall speaking with Capstone employees. SOF Resp. 65.

Despite the intensity of discovery, the record remains devoid of documentary evidence that due diligence was carried out before entering into the quota share arrangements. *See Patel*, T.C. Memo. 2024-34 at *40 (finding a lack of due diligence to be evidence of a lack of arm's length negotiations). In particular, there is no indication that Capstone's FinServ-insured risks (insured, in turn, through PoolRe) were different from the risks that PoolRe ceded to FinServ under the quota share policies. The risks that PoolRe purported to assume under the stop loss endorsements related to a wide range of businesses and to a wide range of lines of insurance. There is no evidence that the risks were had comparable loss distributions. Plaintiff's version of the facts simply does not address these discrepancies. *Celotex Corp*, 477 U.S. at 323.

**2. PoolRe did not charge actuarially determined premiums.**

There is a genuine dispute that the market does not appear to play a role in how PoolRe determined its premiums. *Ocean Drilling,* 988 F.2d at 1153. PoolRe charged a one-size-fits-all rate for each individual entity that participated in the quota share arrangement despite the fact that the risks in the pool were not homogeneous. SOF Resp. ¶ 73. (In other words, a variety of businesses with diverse risks based on differing industries and geographic locations participated in the pool.) SOF Resp. ¶ 123. And yet FinServ and all other captives in the PoolRe pool paid the same proportion of total premiums for stop loss coverage and had the same

attachment point. This arrangement would only make sense if the risks for each captive are homogenous. If not, relatively lower risk pool participants would overpay to the pool as they would be taking on risk from higher risk pool participants who paid the same proportion of total premiums for stop loss coverage. SOF Resp. ¶ 123.

Compounding the uncertainty, nothing has been produced in discovery that reflects PoolRe's calculations of the premium amount. The most plaintiff can point to is a post-hoc (2018) actuarial report analyzing the attachment point in the Joint Stop Loss Endorsement, which determined the percentage of subject premium that should be allocated to the PoolRe joint stop loss endorsements based on several flawed assumptions. SOF Resp. ¶¶ 72, 78, 80, 96, 101, 108, 110, 112; *see also Swift*, T.C. Memo. 2024-13 at *20-21; *Rsrv. Mech.*, T.C. Memo. 2018-86 at *43. *See also Rsrv. Mech*, 34 F.4th at 906, 912. In addition, the minimal number of claims paid out of the pool suggests that premiums should have been much lower. *See infra* at XX. Yet again, plaintiff fails to address these inconsistencies with real information, relying mostly on unsupported declaration testimony from individuals with an interest in the case.

**3. Plaintiff has not established that PoolRe's coinsurance contracts existed, or what amount of risk they distribute.**

Finally, plaintiff alleges that Wesco ceded Aria SAC a portion of the risks related to a pool of vehicle service contracts. Aria SAC then ceded a portion of these risks to CreditRe who then ceded a portion of those risks to PoolRe who then ceded a small portion of those risks to FinServ.

However, plaintiff did not provide evidence that the vehicle service contracts, which formed the basis for the reinsurance that PoolRe re-ceded in the coinsurance contracts, actually existed. Furthermore, plaintiff could not provide the original contracts between Wesco and Aria SAC that show the amount of risk originally ceded. While plaintiff produced agreements between Wesco and Aria SAC, those agreements reference a segregated account number 63 while the agreement between Aria SAC and PoolRe referenced different numbers.. At deposition, Feldman testified that he believed the 2016 arrangements involved not Wesco, but a company called Life of the South. SOF Resp. ¶¶ 75(b), 76, 84.

Plaintiff thus has not demonstrated that the vehicle service contracts were legitimate or provided support for the amount of risk that was ultimately ceded to FinServ, nor that the amount was more than *de minimis. See Rsrv. Mech.,* T.C. Mem 2018-86 at *16; *Celotex,* 477 U.S. at 322.

* * *

Plaintiff is fully aware that another court has found the above considerations material to determining whether FinServ and PoolRe's arrangements distribute risk. *Rsrv. Mech. Corp.*, T.C. Memo. 2018-86at *12 & *14-16. Rather than addressing any of the above questions related to FinServ's own policies, plaintiff simply settles on naked assertions in Mr. Feldman's declaration. But as discussed below, the contrast between those assertions and other information creates the need for a credibility determination, which is the province of trial. *See infra* at 39-41.

### D. FinServ is not insurance in the commonly accepted sense.

The existence of a genuine dispute as to either risk shifting or risk distribution would be enough to determine that requires trial, not summary judgment. But similar doubt exists regarding Capstone's ability to demonstrate that its arrangement with FinServ comports with common indicia of insurance. *Ocean Drilling,* 24 Cl. Ct. at 728*; Rsrv. Mech. Corp.,* T.C. Memo. 2018-86 at *12.

This line of inquiry is broadly defined and factually intensive, even under plaintiff's preferred statement of the test. *See Ocean Drilling,* 988 F.2d. at 1151 (considering elements of "commonly accepted notions of insurance"). It includes not only issues of form, but of substance, including whether accounts and business operations were commingled or separate (including whether premiums were actually paid), whether premiums were reasonably set, whether claims were paid, and whether the insurer engaged in traditional investments. *Id.*, *accord Rsrv. Mech. Corp.*, 34 F.4th at 913.

Genuine questions and the nature of Capstone, FinServ, and PoolRe's intertwined ownership and management relationships—including their potential effect on premium setting—have already been detailed above. Those questions conflict with plaintiff's form-oriented presentation of the issue and contribute to additional uncertainties in analyzing other indicia of insurance, specifically, (1) whether Capstone actually paid its premiums, (2) whether it engaged in traditional investment strategies, and (3) whether it actually processed claims according to standardized processes.

### 1. Doubt surrounds whether Capstone paid its premiums.

After extensive discovery, the material available to the parties does not clearly demonstrate that plaintiff actually paid premiums to FinServ, given the comingling of business operations and accounts among various Feldman-Matz affiliated business interests. Review of these entities' general ledgers and journal entities create a question of whether these amounts were instead paid by the Feldman Law Firm (which ran Capstone's administrative office functions). SOF Resp. ¶¶ 113-114, 135, 152, 160.

Under a Shared Services Agreement ("SSA") (signed in four places by Feldman, once for each entity), Capstone, its parent corporation, and another Feldman-Matz-owned entity outsourced a number of functions to the Feldman Law Firm, arranging to have insurance coverage," accounting, reporting, treasury, cash management, risk management, and human resources. SOF Resp. ¶¶ 80(b), 150. But the general ledger for the Feldman Law Firm shows only that *it* made the payments, without any clear corresponding transfer of monies from Capstone to cover the costs. *See, e.g.,* SOF Resp. ¶ 135. The only other related ledger entries are non-cash adjustments that do not result in the movement of cash. ECF 180-1 at 140; SOF Resp. ¶¶ 154, 155, 177.

In addition, the information available shows that the amount on the ledger is an aggregate quarterly payment, and none of the information received in discovery explains how that number divides down among the signatories to the SSA, all of whom are named insureds on FinServ's policies. *Id.;* ECF 187-1 ¶ 162. The only documentary evidence offered to explain the allocation among the three SSA

participants is a memorandum drafted two years into this litigation and a table produced in response to one of the United States' Interrogatories. SOF Resp. ¶ 164. And the allocation used (a 50/25/25 split) is inconsistent with other allocation methods under the SSA, which break out by actual, per space, or per capita costs. *See, e.g.*, SOF Resp. ¶ 157. Only taxes and insurance premiums are allocated using the 50/25/25 split. *Id.*

Capstone's tax return for 2016 only raises more questions. SOF Resp. ¶ 86, 113, 128, 135-136, 44, 158-159, 162. Statement 1 thereto describes various insurance coverages and dollar amounts, but none of these equal the amount claimed by plaintiff as a deduction. *Id.* And plaintiff's accountant provided yet a third amount during Capstone's audit. *Id.* Even Franks, the controller for the Feldman Law Firm, could not explain the discrepancy. *Id.*

These multiple discrepancies call into question whether Capstone's microcaptive arrangement is operating consistent with the practices of a bona fide insurance company or simply being used, as *Avrahami* cautions against, to move money "from one pocket to another." *Avrahami*, 149 T.C. at 179.

**2. FinServ did not make "traditional investments."**

Relatedly, multiple courts have considered whether a microcaptive's surplus is invested traditionally, or in a way that simply returns the economic benefit of the tax exempt funds to a related party. *See Ocean Drilling,* 988 F.2d at 1139–40 *,* *Avrahami*, 149 T.C. 144, 193. In particular, the *Avrahami* court cautioned against self-dealing via loans to related parties or trust arrangements designed to allow the money to pass to new generations without being subject to gift and estate taxes.

*Id.*at 179-80. The nature of the investment also matters because it affects the amount of liquid assets the insurance company has available to pay claims. *Syzygy*, T.C. Memo. 2019-34 at 39-40.

Yet again, the information available through discovery reveals numerous financial agreements between FinServ and other related entities that generate genuine disputes of fact. SOF Resp. ¶ 131. Two loans are for real property that was constructively owned by Feldman and Matz – one is their personal residence, and the other is a secondary residence in Vail, Colorado. SOF Resp. ¶¶ 52, 131. A third loan is an agreement between FinServ and Stephen Friedman, the owner of PoolRe. SOF. Resp. ¶¶ 64, 65, 71, 128, 171. As collateral, Friedman pledged 100% of the PoolRe's stock. *Id.* Should Friedman default, FinServ would receive and be in control of 100% of the stock of PoolRe (an entity plaintiff alleges was "distinct"). *Id.* The remaining two loans involve other affiliated business interests of Feldman and Matz who are co-named insureds on Capstone's policies. SOF Resp. ¶ 131.

Finally, FinServ is owned in part by a trust that benefits Feldman, Matz, and their two children. SOF Resp. ¶ 43. At the summary judgment stage, this appears a far different situation than that in *Ocean Drilling,* 988 F.2d 1135 (Fed. Cir. 1993) (noting "traditional" investments including high grade CDs) and far more like the investments viewed with skepticism in *Syzygy* and *Kadau*. *Syzygy,* T.C. Memo. 2019-34 at *39-41 (skeptical were more than 50% of assets were in investments that could not be accessed to pay claims); *Kadau v. Comm'r*, T.C. Memo. 2025-81 at 31

(questioning operation like insurance where only investment was a life insurance policy).

**3. FinServ's claim processing and payment were idiosyncratic.**

Finally, genuine questions exist surrounding the way in which Capstone processed and paid claims. While plaintiff relies chiefly on the existence of policy and procedure manuals, *see* ECF 187-1 ¶¶ 110-111, 124, 140, other documents and testimony plausibly suggest an alternative story. *See* SOF Resp. ¶¶ 110-111, 124, 140. Notably, one of Capstone's three 30(b)(6) witnesses could not identify whether a memorandum from Feldman regarding payment of FinServ claims was written by Feldman-as-Capstone-as-insured or Feldman-as-Capstone-as-insurance manager. SOF Resp. ¶ 135.

The best illustrations come from the two Capstone claims that plaintiff identifies as relevant to 2016, the Ward claim and the Genitempo claim. The Ward claim file, Pl. Ex. 88, includes only a FinServ-created ledger and a single paragraph, excerpted from an unknown document, discussing the claim's disposition. SOF Resp. ¶ 138. The file does not describe why the claim was considered covered by the applicable policy or policies, how the split among policies was determined, or how coverage was allocated among FinServ and A.M.Y. SOF Resp. ¶ 138. The file does not include any documentation to show what was being paid or how the amounts were derived. Nothing shows a contemporaneous review of the file or the approval process, or proves that any payment was made. SOF Resp. ¶ 138. And at deposition, Feldman could not confirm the applicable policy year, stating that the insured wouldn't care, as long as the claim was covered. SOF Resp. ¶ 138.

Documentation related to the Genitempo claim suffers similar flaws: again, at deposition, looking at the produced documents, Feldman could not say what policy year applied—the date of loss was in 2014, the notice to FinServ occurred in 2015, and in litigation, Capstone identified it as a 2016 claim. SOF ¶ 139. The minimal available documentation is identical to the scant information provided for the Ward claim. SOF ¶ 139.

Taken together, the claim files do not reflect that FinServ established "the validity of claims . . . before payments were made." *Ocean Drilling* at 1151.

* * *

Rather than engage with reality, plaintiff's summary judgment filings heavily emphasize only those factors that focus on form: such as whether FinServ had a business plan, had written policies and procedures, complied with the requirements of its domiciliary jurisdiction, and complied with the Internal Revenue Code's limits on premium payments.[12] ECF 181 at 40.

### III. The motion is plagued by issues of evidentiary weight: materiality and credibility

The final issues plaguing plaintiff's motion for summary judgment relate to the weight of the information on which it relies. On the one hand, plaintiff accords too much weight to information the Court has already explained carries none: the

[12] Plaintiff again, as it has throughout this case, relies on IRS actions as to FinServ and its tax reporting. As discussed below and repeatedly recognized by this Court, those considerations are immaterial to determining whether Capstone's arrangement with FinServ constituted bona fide insurance under the Internal Revenue Code, given the *de novo* nature of the Court's review. *See* ECF 34 at 5; *see also Cutting Underwater Technologies USA, Inc. v. Eni U.S. Operating Co.*, 671 F.3d 512, 515 (5th Cir. 2012).

actions of the IRS as to Capstone, FinServ, PoolRe, and other entities. On the other, plaintiff asks the Court to give ultimate, dispositive weight to declarations by interested parties, when the credibility of those statements is more properly weighed in the full context of a trial.

**First:** as it has in multiple prior filings in this case, plaintiff spends significant ink detailing the history of this case before the IRS, as well as filings with the IRS made by the involved entities—Capstone, FinServ, and PoolRe. More than that, it asks the Court to derive meaning from the IRS's actions as to wholly unrelated third parties. But as the Court has held time and time again, such facts are wholly irrelevant—and thus immaterial—to the determination of whether Capstone's micro-captive insurance arrangement with FinServ and PoolRe qualifies for a deduction under the Code. See ECF 34 at 3-4 (citing, inter alia, *Leighton v. United States*, 155 Fed. Cl. 543-49 (2021); *Cook v. United States*, 46 Fed. Cl. 110, 113 (2000)); *Anderson*, 477 U.S. at 248 (a genuine issue of material fact is one that could "affect the outcome" of the litigation).

**Second:** the motion relies heavily on two declarations for key assertions. Although RCFC 56 contemplates the use of declarations in a summary judgment motion, an affidavit cannot be used to circumvent the Court's need to evaluate a witness's credibility when there are facts call that credibility into question. *TypeRight Keyboard Corp. v. Microsoft Corp.*, 374 F.3d 1151, 1159 (Fed. Cir. 2004); *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 266 F.3d 1358, 1363 (Fed.Cir.2001). Indeed, where the parties "offer vastly different characterizations of

. . . the record," the credibility of those characterizations is "critical." *EFC Servs.,* 172 Fed. Cl. at 700.

The first declaration is from Feldman, Plaintiff's owner, who has ownership and other financial interests in every entity involved in the micro-captive transaction at issue. His financial interest in the case is apparent from both parties' filings. ECF 44 ¶ 5. And his declaration notably contradicts his own testimony on the material facts, including the assertion that FinServ follows its own claim processing policies and procedures. *See, e.g., supra* at 38-39.

The second is Franks, the controller at Feldman's law firm, who provided accounting and other services to the entities at issue and comes now to defend his own work. Franks, moreover, has been disclosed as an expert witness, and his declaration includes a large part of the work from his expert report (despite plaintiff's assertions that experts are unnecessary). ECF 181 at 27. That report, tries to supplement and expand on the matters discussed in Mr. Frank's deposition: defending his accounting, ranting about the IRS activities during audit, and offering to provide further information if the government would simply request it. *See generally,* ECF 141-22. His own conclusion highlights the questions about both his credibility and plaintiff's refusal to accept *de novo* review (*Id.* at 18-19):

> I reject the conclusions of [defendant's expert's] report, which seen in its best light, must be viewed as his jumping from "I can't figure it out" to "it wasn't paid". This on its own is a giant leap, which it appears consistent with the revenue agent's report being preordained back from to the 4th quarter of 2018 with the orchestrated involvement of 50 plus IRS personnel whose directions were to go through the mechanics of an audit and then deny the deductions for Capstone and the other listed

entities and for the Feldmans. This is what the IRS appears to have done. CAS-52390-A-CAS-52301-A.

Adjudicating the credibility issues demonstrated above, in the face of complex fact-intensive questions, is a question left for trial. *Cheung*, 146 Fed. Cl. at 379.

## IV. Summary judgment on penalties is tied to success on the merits.

Section 6662(b)(1) and (2) impose a 20-percent accuracy-related penalty on the portion of an underpayment attributable to either (1) negligence or disregard of rules or regulations or (2) any substantial understatement of income tax. Although there are various statutory and regulatory defenses to an accuracy-related penalty, where an item of income is attributable to a tax shelter, neither adequate disclosure with a reasonable basis nor substantial authority will excuse a taxpayer's understatement. I.R.C. § 6662(d)(2)(C).

Facts and circumstances supporting the penalty should be examined and tested through the very discovery process that plaintiff seeks to avoid. Plaintiff tacitly acknowledges this point—its argument is simply that if the Court rules in its favor on the substantive question (whether Capstone's micro-captive arrangement with FinServ constitutes bona fide insurance under the Code), then penalties should not apply. ECF 181 ¶ 45; *see also* SOF ¶¶ 180-182 (allegations better characterized as legal conclusions). Defendant opposes summary judgment on the penalties for the same reason it opposes on the substantive liability.

## CONCLUSION

For the reasons stated herein, and in the United States' Response to Plaintiff's Statements of Material Fact, the United States requests that the Court

deny plaintiff's Motion for Summary Judgment and calendar this case for trial.

Respectfully submitted,

February 3, 2026

BRETT A. SHUMATE
Assistant Attorney General

JOSHUA WU
Deputy Assistant Attorney General
Tax Litigation Branch

*/s/ Jason A. Bergmann*
Assistant Director

*/s/ Joseph A. Sergi*
JOSEPH A. SERGI
Senior Litigation Counsel
Tax Litigation Branch
Civil Division
Department of Justice
P.O. Box 26
Washington, DC 20044
Tel.: (202) 307-6627
joseph.a.sergi@usdoj.gov
MARGARET E. SHEER
Senior Litigation Counsel

AMANDA J. CORNWELL
ANTHONY COGNASI
Trial Attorneys

Attorneys for Defendant