IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 21-913 T
(Judge Kathryn C. Davis)

CAPSTONE ASSOCIATED SERVICES, LTD.,
by and through CAPSTONE HOLDINGS CORP.,
Tax Matters Partner,

Plaintiff,

v.

THE UNITED STATES,
Defendant.

Plaintiff's Reply in Support of its Motion for Summary Judgment

Table of Contents

I. Introduction. .......... 1

II. The applicable legal test as set forth by the Federal Circuit. .......... 1

III. The government seeks to invalidate Congressionally authorized IRC § 831(b) insurance companies *ab initio*. .......... 7

IV. Contrary to controlling Federal Circuit precedent, the government relies on the proposition that common ownership of the insurance company and the insured company invalidates captive insurance. .......... 11

V. Under the applicable legal test, there is no dispute of fact. .......... 13

A. The government has not established a dispute of material fact regarding risk transfer under the Federal Circuit test. .......... 13

B. The government has not established a dispute of material fact regarding risk distribution under the Federal Circuit test. .......... 14

C. The government has not established a dispute of material fact under *Moline*. .......... 18

VI. Observations regarding the government's response to Capstone's factual statement. .......... 21

VII. Conclusion. .......... 25

# Table of Authorities

## Cases

*Alinco Life Ins. Co. v. United States,* 178 Ct. Cl. 813 (Ct. Cl. 1967) .......................... 10
*Amaretto Ranch Breedables v. Ozimals Inc.,* 907 F.Supp.2d 1080 (N.D. Cal. 2012) .................... 21
*AMERCO & Subs. v. Comm'r,* 98 T.C. 18, 38–39 (1991) .................... 3
*Ayala v. Costco Wholesale Corp.,* 2020 U.S. Dist. LEXIS 178850 (C.D. Cal. 2020) .. 21
*Benenson v. Comm'r,* 910 F.3d 690 (2d Cir. 2018) .................... 10
*Boulware v. United States,* 552 U.S. 421 (2008) .................... 10
*Boykin v. Family Dollar Stores of Michigan, LLC,* 3 F.4th 832 (6th Cir. 2021) ....... 21
*Caylor Land & Dev., Inc., v. Comm'r,* T.C. Memo. 2021-30 (T.C. 2021) .................... 14
*Cobert v. Miller,* 800 F.3d 1340 (Fed. Cir. 2015) .................... 7
*Colonial Penn. Ins. Co. v. Am. Centennial Ins. Co.,* 1997 U.S. Dist. LEXIS 133 (S.D.N.Y. 1997) .................... 17
*Comm'r v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134 (1974) ........... 8
*Ford Motor Co. v. United States,* 908 F.3d 805 (Fed. Cir. 2018) .................... 11
*Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205 (1979) .................... 4
*Hart v. Massanari,* 266 F.3d 1155 (9th Cir. 2001) .................... 7
*Haynes v. United States,* 353 U.S. 81 (1957) .................... 4, 5, 23
*Helvering v. Le Gierse,* 312 U.S. 531 (1941) .................... 1, 3, 4, 5, 6
*Hill v. Tangherlini,* 724 F.3d 965 (7th Cir. 2013) .................... 21
*Keenan v Allan,* 91 F.3d 1275 (9th Cir. 1996) .................... 13
*Kidde Indus. v. United States,* 40 Fed. Cl. 42 (Fed. Cl. 1997) ................ 11, 15, 16, 20
*Kraft Foods Co. v. Comm'r,* 232 F.2d 118 (2d Cir. 1956) .................... 8
*Maxwell Hardware Co. v. Comm'r,* 343 F.2d 713 (9th Cir. 1965) .................... 11
*Mazzei v. Comm'r,* 998 F.3d 1041 (9th Cir. 2021) .................... 9
*Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943) .................... 1, 2, 6, 7, 11, 14, 16, 18, 19, 20
*Monsanto Co. v. Scruggs,* 459 F.3d 1328 (Fed. Cir. 2006) .................... 13
*Morrison v. Comm'r,* T.C. Memo. 2005-53 (T.C. 2005) .................... 8
*Nat'l Carbide Corp. v. Comm'r,* 336 U.S. 422 (1949) .................... 11
*Newell Cos. V. Kenney Mfg. Co.,* 864 F.2d 757 (Fed. Cir. 1988) .................... 23
*Ocean Drilling & Exploration Co. v. United States,* 988 F.2d 1135 (Fed. Cir. 1993) .................... 1, 2, 3, 5, 6, 7, 11, 15, 16, 19, 20, 21
*Oxford Asset Mgmt. v. Jaharis,* 297 F.3d 1182 (11th Cir. 2002) .................... 21

*Rent-A-Center, Inc. v. Comm'r,* 142 T.C. 1 (T.C. 2014)............................................ 12
*Reserve Mechanical Corp. v. Comm'r,* 34 F.4th 881 (10th Cir. 2022)........... 16, 17, 23
*Rodriguez v. Señor Frog's De La Isla, Inc.,* 642 F.3d 28 (1st Cir. 2011).................... 22
*Salem Fin., Inc. v. United States,* 786 F.3d 932 (Fed. Cir. 2015) ............................. 22
*Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565
(Fed. Cir. 1991) ..................................................................................................... 22
*Sears, Roebuck & Co. v. Comm'r,* 972 F.2d 858 (7th Cir. 1992) ............................... 10
*Summa Holdings, Inc. v. Comm'r,* 848 F3d 779 (6th Cir. 2017)............................... 10
*Travelers Ins. Co. v. United States,* 46 Fed. Cl. 458 (Fed. Cl. 2000)......................... 22
*Tripathy v. McCloskey,* 2024 U.S. Dist. LEXIS 89478 (S.D.N.Y. 2024) .................... 23
*United States v. Fagan,* 821 F.2d 1002 (5th Cir. 1987)............................................ 22

**Statutes**

§ 302(g) of Rev. Act of 1926 ........................................................................................ 4
IRC (26 U.S.C.) (1939) § 22(b)(5).................................................................................. 5
IRC § 162...................................................................................................................... 19
IRC § 301...................................................................................................................... 10
IRC § 316(a) ................................................................................................................. 10
IRC § 7201.................................................................................................................... 10
IRC § 831...................................................................................................................... 10
IRC § 831(b) ..................................................1, 3, 6, 7, 8, 9, 10, 11, 13, 19, 20, 23, 25
Pub. Law No. 114–113, § 333, 129 Stat. 2244, 3106–08 ..................................... 10, 13

**Other Authorities**

Black's Law Dictionary (6th ed. 1990) ....................................................................... 17
Rev. Rul. 2001-31 ......................................................................................................... 12

**Rules**

Fed. R. Evid. 1002......................................................................................................... 22
RCFC 56 ....................................................................................................................... 17
RCFC 56(a).................................................................................................................... 22
RCFC 56(c)(1)(A)...................................................................................................... 13, 18

**Regulations**

Treas. Reg. § 601.601(e)................................................................................................ 12

## I. Introduction.

Had the Federal Circuit wanted to adopt the Tax Court's test for insurance, it would have done so and said so. Instead, it focused on the traditional requirements for insurance—risk transfer and risk distribution—and adopted a simple test for determining whether those requirements were satisfied. Concerns over whether the taxpayer was abusing the corporate form were addressed by the Federal Circuit under *Moline,* not under an expansive interpretation of insurance. Because the government is apparently "displeased" with the tax benefits Congress conferred under IRC § 831(b), the government improperly seeks to invalidate IRC § 831(b) insurance companies *ab initio.* In so doing, the government improperly relies on the economic-family argument, which was rejected by the Federal Circuit. Because the other considerations the government relies on are immaterial under the applicable legal test, it has failed to establish a genuine dispute of material fact.

## II. The applicable legal test as set forth by the Federal Circuit.

The central dispute between the parties is the applicable legal test. The determination of the applicable legal test will determine the materiality of any alleged disputes of material fact. Capstone contends that the applicable legal test for captive insurance is found in *Ocean Drilling & Exploration Co. v. United States,* 988 F.2d 1135 (Fed. Cir. 1993). That test consists of three parts that the Federal Circuit derived from the Supreme Court's decisions in *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436 (1943) and *Helvering v. Le Gierse,* 312 U.S. 531 (1941): (1) whether the insurance company is a separate company from the insured or is it a

sham; (2) whether the insured transferred risk to the insurance company; and (3) whether the insurance company distributed that risk. Risk transfer addresses whether the insured transfers risk to the insurance company as measured by whether the payment of a claim by the insurance company to the insured will adversely affect the insured's balance sheet and net worth. Risk distribution addresses whether the insurer has policyholders other than the insured in question. Ultimately these questions relate to whether the insurance company has unrelated business to the insured. In determining unrelated business, the Federal Circuit rejects the economic-family argument, which essentially contends that corporate separateness of affiliated corporate entities may be ignored. Rather, the Federal Circuit acknowledges the lessons of *Moline* that separate corporate entities are to be treated separately, even if affiliated. The importance of the *Moline* analysis is to determine if the common owner of affiliated corporate entities is respecting the corporate formalities sufficiently such that the insurance company may be considered a separate company to which risk may be transferred.

As opposed to the Federal Circuit's test in *Ocean Drilling,* the government prefers the Tax Court's four-part test: (1) the existence of an insurable risk; (2) risk shifting; (3) risk distribution; and (4) the hallmarks of commonly accepted notions of insurance. Gov't resp. (dkt. 188) at 2. The Federal Circuit was aware of this test but did not adopt it. *See Ocean Drilling,* 988 F.3d at 1144 (noting that the cases addressing captive insurance companies from other jurisdictions were not binding precedent); 1152 (noting that "[u]nlike this court's analysis, the Tax Court's

discussions did not focus solely on the amount of unrelated business"); 1153 (noting that the facts would support a finding of risk shifting under the Tax Court's analysis "in addition to being present under this court's own analysis"); 1153 (noting that since risk shifting and risk distribution were present, the premium payments were for insurance and, therefore, deductible). While the government attempts to shoehorn the Federal Circuit's analysis into the Tax Court test, a careful reading of *Ocean Drilling* reveals that the Federal Circuit did not follow the Tax Court's test. Had the Federal Circuit wanted to adopt the Tax Court's test, it would have said so and not distinguished its test from the Tax Court test.

One question before the Court involves the concept of "commonly accepted notions of insurance," and what role, if any, that plays in the applicable legal analysis. "Commonly accepted notions of insurance" is fundamental to the Tax Court's disallowance of the claimed tax benefits in the IRC § 831(b) cases it has decided. *See* cases cited at gov't resp. at 8 n. 6. Essentially, the government and the Tax Court require that the IRC § 831(b) insurance company (what the government and the Tax Court call "microcaptives") conduct their business as if they were commercial insurance carriers. If they fail to mimic commercial carriers, then they are not deemed to be insurance companies and the policies they sell are not deemed to be insurance. Although the government and the Tax Court claim that the requirement for commonly accepted notions of insurance derives from *Le Gierse*—*see AMERCO & Subs. v. Comm'r,* 98 T.C. 18, 38–39 (T.C. 1991)—it in fact is just a requirement that they have added to constrain their definition of insurance.

The Federal Circuit's reading of *Le Gierse* as requiring only risk shifting and risk distribution for insurance is consistent with a careful reading of *Le Gierse.* The Supreme Court stated that "[h]istorically and commonly insurance involves risk-shifting and risk-distributing." 312 U.S. at 539. The Court said in the next paragraph that "[a]nalysis of the apparent purpose of the partial exemption granted in § 302(g) strengthens the assumption that Congress used the word 'insurance' in its commonly accepted sense." *Id.* at 540. But contrary to the position of the government and the Tax Court, this use of the term "commonly accepted sense" did not introduce an additional requirement for insurance. "Commonly accepted sense" as used by the Supreme Court merely refers back to the "historically and commonly accepted" notion of insurance that "involves risk-shifting and risk-distributing." *Id.* at 539–40. *See also Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211 (1979) ("The primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk.").

The proposition that insurance must mimic commercial insurance to be considered insurance is also inconsistent with other Supreme Court precedent. In *Haynes v. United States,* Southern Bell Telephone and Telegraph Company provided payment of specified amounts to its employees who were disabled by accident or sickness. 353 U.S. 81, 82–83 (1957). The government argued the plan was not health insurance and, consequently, payments made by Southern Bell to Haynes under the plan constituted taxable income as opposed to nontaxable health-insurance payments. *Id.* at 83–84. Applying a simple test, the Supreme Court found

that the plan constituted health insurance because the company indemnified the employee for losses caused by illness. *Id.* at 83. The Supreme Court rejected the government's contention that the plan was not health insurance because (a) employees paid no fixed premiums, (b) there was not a definite fund created to assure payment of the disability benefits, and (c) the amount and duration of the benefits varied with length of service. *Id.* at 83–84. The Supreme Court observed that "[a]pparently the Government relies on these facts primarily to show that Southern Bell's plan did not contain features which would be present in the normal commercial insurance contract. The Government, however, offers no persuasive reason why the term 'health insurance' in § 22 (b)(5) should be limited to the particular forms of insurance conventionally made available by commercial companies. Certainly there is nothing in the language of § 22 (b)(5) which compels this limitation." *Id.* at 84.

The Federal Circuit, in deciding whether the captive-insurance arrangement in *Ocean Drilling* was insurance, was aware of the Tax Court framework and its reliance on commonly accepted notions of insurance. *Ocean Drilling,* 988 F.2d at 1148–49 (discussing elements of Tax Court's multi-step analysis and their application). Nevertheless, the Federal Circuit requires only a showing of risk transfer and risk distribution for there to be insurance. 988 F.2d at 1153 ("Since risk shifting and risk distributing were present, the court finds that insurance exists as outlined in *Le Gierse.*").

The Federal Circuit used the term "commonly accepted notions of insurance" immediately before performing its *Moline* analysis. *Ocean Drilling,* 988 F.2d at 1151. But when it did so, it merely noted that the facts that it considered under *Moline* would also satisfy the Tax Court's commonly accepted notions requirement. The Federal Circuit was not suggesting that it was incorporating commonly accepted notions as part of its own test.

Is this a distinction without a difference? Did the Federal Circuit really adopt the "commonly accepted notions of insurance," but just within the context of its *Moline* analysis? The answer is "no" to both questions. The Federal Circuit is concerned with indicia of whether the companies are separate entities such that risk may be transferred and distributed. The government and the Tax Court are imposing the requirement that IRC § 831(b) insurance companies mimic commercial insurance carriers to be considered insurance companies and for their policies to be considered insurance. The government and the Tax Court use the concept of commonly accepted notions of insurance to constrain the definition of insurance by adding additional requirements to those imposed by the Supreme Court in *Le Gierse*. Indeed, it appears that in every IRC § 831(b) insurance company case it has decided the Tax Court has used the concept to invalidate the insurance. *See* cases cited in gov't resp. at 8 n. 6.

The Federal Circuit, by contrast, was concerned with determining whether the insurance company was a separate entity such that risk may be transferred to it. If the company was not operated by its owners as a separate entity from the

insured, then no risk could be transferred, and the insured was essentially engaging in self-insurance. Thus, facts stated in support of the Federal Circuit's *Moline* analysis were not requirements, but rather an array of supporting facts. That some may be present or absent in a subsequent case does not mean that a corporation is or is not separate under the *Moline* test.

Because there has been no statutory change supporting the Tax Court's restrictive analysis or any intervening Supreme Court or Federal Circuit case adopting the Tax Court's test, the test contained in *Ocean Drilling* and its interpretation of the requirements for insurance are controlling. *See, e.g., Cobert v. Miller,* 800 F.3d 1340, 1349 (Fed. Cir. 2015) (determining that Merit Systems Protection Board "erred as a matter of law in abandoning" the two-step legal analysis set forth by the Federal Circuit); *Hart v. Massanari,* 266 F.3d 1155, 1170 (9th Cir. 2001) ("Binding authority must be followed unless and until overruled by a body competent to do so."). *See also* gov't resp. at 12 n. 9.

The Federal Circuit test, unlike the Tax Court test, focuses on the fundamental concept of insurance and whether corporate formalities were followed. Had the Federal Circuit wanted to adopt the Tax Court test for insurance, it would have done so and said so.

## III. The government seeks to invalidate Congressionally authorized IRC § 831(b) insurance companies *ab initio.*

The government states that IRC § 831(b) insurance companies have "potential for abuse" because the insurance company may return the funds it receives for premiums to the insured through (1) loans, (2) dividends, or (3) using

the money for the insured's benefit, such as purchasing property for the insured's use. Gov't resp. at 7. The government adds that the insurance company: (1) "might" pay out few claims, pay tax only on investment income, and accumulate a large surplus, which "might" be lent out to the insured's affiliates or "'doled out in 'large dividend payments to its stockholders' in a tax-sheltered IRA[,]" or (2) "might" avoid estate and gift taxes if the insurance company is owned by the business owner's children. *Id.* at 9. The Commissioner is "displeased" by these risks. *See id.* But rather than challenge actual tax abuse, the government essentially argues that IRC § 831(b) insurance companies are void *ab initio*. But taxation depends on what was actually done, not what might have been done. *Comm'r v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148 (1974) (referring to the "established tax principle that a transaction is to be given its tax affect in accord with what actually occurred and not in accord with what might have occurred.").

A corporation may make loans to its shareholders and to affiliated entities. *See, e.g., Kraft Foods Co. v. Comm'r,* 232 F.2d 118, 124–26 (2d Cir. 1956) (allowing interest deduction on a note between related parties); *Morrison v. Comm'r,* T.C. Memo. 2005-53 (T.C. 2005) (finding that payments by corporation of shareholder's tax liability, direct disbursements to shareholder, and shareholder's purchases of personal items on company credit card were non-taxable loans to shareholder, not taxable constructive dividends). There is, of course, a potential for abuse in that the controlling shareholder may not intend to repay the loans. In such a case, the

controlling shareholder has received a constructive dividend, which is taxable to the shareholder. But it is the purported loan that is invalid, not the entire corporation.

The government has chosen to attack IRC § 831(b) insurance companies for being IRC § 831(b) insurance companies. It would seem to be easier and more economical for the government instead to attack the transactions that it says it is concerned about, such as disguised or constructive dividends, without the expensive expert analyses of "commonly accepted notions of insurance." In any event, the government's objection is not to any specific tax abuse of Capstone, such as fake loans or constructive dividends. Rather, the government's objection is to IRC § 831(b) insurance companies in general. That is, the government finds objectionable Congress' action in enacting IRC § 831(b) and authorizing companies to obtain the tax benefits Congress intended through IRC § 831(b).

But the immovable fact remains that Congress authorized IRC § 831(b) insurance companies. In doing so, Congress must have meant to authorize something by enacting that provision. And that something cannot simply be a micro version of a commercial insurance carrier. Insurance under IRC § 831(b) allows small businesses to set up small, affiliated insurance companies with tax benefits, as opposed to establishing an uneconomical commercial insurance carrier that has actuaries, a claims department, significant amounts of unrelated business, all for premiums of $1.2 million. *Cf. Mazzei v. Comm'r,* 998 F.3d 1041, 1056 (9th Cir. 2021) (observing that the problem with the Commissioner's analysis "is that its underlying premises are directly contrary to what is expressly contemplated by the

FSC [foreign sales corporation] statute."); *Benenson v. Comm'r,* 910 F.3d 690, 701 (2d Cir. 2018) (by legislating the characterization of the tax payments, Congress "left no room for the Commissioner to recharacterize the payments as something other than commissions[.]"); *Summa Holdings, Inc. v. Comm'r,* 848 F3d 779, 782 (6th Cir. 2017) ("Because Summa Holdings used the DISC and Roth IRAs for their congressionally sanctioned purpose—tax avoidance—the Commissioner had no basis for recharacterizing the transactions and no basis for recharacterizing the law's application to them."). And it is up to Congress—not the Internal Revenue Service—to change the law. *See Boulware v. United States,* 552 U.S. 421, 434 (2008) ("If [IRC] § 301, § 316(a), or § 7201 could stand amending, Congress will have to do the rewriting."). For example, Congress addressed any concerns about excessive premiums to IRC § 831(b) insurance companies by imposing a dollar limit on premiums in IRC § 831(b). Congress addressed the estate-tax-avoidance concern through its 2015 amendment to IRC § 831. Pub. Law No. 114–113, § 333, 129 Stat. 2244, 3106–08 (effective for tax periods beginning after Dec. 31, 2016) (PATH Act).

The government is confusing its preferred tax policy with that enacted by Congress. *See Summa Holdings,* 848 F3d at 787 ("But it's odd to reject a Code-compliant transaction in the service of general concerns about tax avoidance."); *Sears, Roebuck & Co. v. Comm'r,* 972 F.2d 858, 868 (7th Cir. 1992) ("Provisions of the Internal Revenue Code do not conflict with 'tax policy,' as the Commissioner seems to believe. They are tax policy and are to be enforced."). *Cf. Alinco Life Ins. Co. v. United States,* 178 Ct. Cl. 813, 829 (Ct. Cl. 1967) ("There is nothing perfidious

or invidious in enjoying a statutory deduction from reportable income. It is not a matter of conscience but of statute and the determination of Congressional intent.") (*quoting Maxwell Hardware Co. v. Comm'r,* 343 F.2d 713, 723 (9th Cir. 1965)).

Through enacting IRC § 831(b), Congress created tax benefits for small insurance companies. It is not up to the government to constrain IRC § 831(b)'s application by demanding that IRC § 831(b) insurance companies mimic commercial insurance companies.

## IV. Contrary to controlling Federal Circuit precedent, the government relies on the proposition that common ownership of the insurance company and the insured company invalidates captive insurance.

The Supreme Court and the Federal Circuit reject the proposition that corporate form may simply be ignored for purposes of determining taxation. Indeed, fundamental to *Moline* is the proposition that corporate form must be respected unless the corporation itself is not organized for a business purpose or does not carry on a business activity. *Moline,* 319 U.S. at 439. And the same is true in the Federal Circuit: "Plaintiff [the insured] and Mentor [the insurance company] must be considered as separate entities in evaluating whether the transactions between the two companies resulted in risk shifting and risk distributing." *Ocean Drilling,* 988 F.2d at 1150. *See also Ford Motor Co. v. United States,* 908 F.3d 805, 809–10 (Fed. Cir. 2018) (noting that corporate ownership and control "'are no longer of significance in determining taxability.'") (*quoting Nat'l Carbide Corp. v. Comm'r,* 336 U.S. 422, 429 (1949)); *Kidde Indus. v. United States,* 40 Fed. Cl. 42, 55 (Fed. Cl. 1997) (noting that tax laws "do not treat corporations as fictitious entities that can

be ignored."). *Cf.* Rev. Rul. 2001-31 (rejecting economic-family analysis for captive insurance); *Rent-A-Center, Inc. v. Comm'r,* 142 T.C. 1, 25 (T.C. 2014) (Buch, J. concurring) ("Because Rev. Rul. 2001-31 has not been revoked, we could treat the economic family argument as conceded."); Treas. Reg. § 601.601(e) (providing that taxpayers may generally rely upon Revenue Rulings).

The government relies on the economic-family argument to establish that Capstone is not entitled to its claimed deductions. Gov't resp. at 6–7 (assuming in its example that abuse is present by purchase of insurance from a "separate but related" company); 7 (noting that captive insurance "carries a particular risk of abuse because the captive and the insured are related, and generally closely held, entities[.]"); 17 (essentially asserting (incorrectly) that because FinServ, Capstone, and other related entities "have the same beneficial owner," the insurance policies were held by "a limited number of entities related to FinServ and Capstone[,]" and Capstone "took money from the affiliated group's right pocket and placed it in its left pocket."). And the government's expert Eckles also relies on the economic-family argument in contending that no risk-shifting occurred. Eckles decl. (dkt. 189-1), ¶¶ 32–34.

While the government ignores its prior concession of the economic-family argument, the holdings of the Supreme Court and the Federal Circuit remain controlling law. The mere fact that the insurance companies and their insureds share common ownership is not a valid reason to disregard their corporate form and disallow the claimed deductions. And, in any event, Congress expressly authorized

IRC § 831(b) insurance companies, which, as clarified by the PATH Act amendment, contemplates common ownership among the insurer and insured.

## V. Under the applicable legal test, there is no dispute of fact.

For a dispute of fact to preclude summary judgment, the dispute must be material to the court's determination under the applicable legal test. *Monsanto Co. v. Scruggs,* 459 F.3d 1328, 1334 (Fed. Cir. 2006). Merely alleging that there are disputes of fact in a general way is insufficient, and vague generalities, supposition, and innuendo are insufficient to defeat summary judgment. *See* RCFC 56(c)(1)(A) ("A party asserting that a fact ... is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record[.]"). Moreover, the government must bring to the Court's attention the material disputes of fact that it relies upon. *Keenan v Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's responsibility to sift through a voluminous record to find disputes of fact upon which to deny summary judgment. *Id.*

### A. The government has not established a dispute of material fact regarding risk transfer under the Federal Circuit test.

As Capstone understands Defendant's argument, risk was not transferred from Capstone to FinServ because: (1) "the direct written policies issued by FinServ did not shift risk because the policies were held by a limited number of entities related to FinServ and Capstone"; and (2) FinServ is a sham because it fails the commonly accepted notions of insurance requirement. Gov't resp. at 17–18. The government's first ground is invalid because it relies on the economic-family argument. The government's second ground is invalid because commonly accepted

notions of insurance do not form a part of the analysis of risk transfer, and, as established in Capstone's opening brief, the undisputed facts establish that FinServ and PoolRe are not sham companies under *Moline.*

As to PoolRe, Capstone understands the government to be arguing that Capstone did not transfer risk to PoolRe because: (1) FinServ held PoolRe's pledged stock and PoolRe was a wholly-owned subsidiary of Capstone; (2) because PoolRe only contracted with Capstone-administered entities, any expenses of FinServ would reduce Capstone's assets; and (3) PoolRe's negligible losses and improperly high premiums create a genuine dispute regarding whether risk was actually transferred through the pool. Gov't resp. at 18–19. The government's first ground is not supported by the cited paragraph. Gov't fact resp. (dkt. 199) at 76–77 (¶44). Moreover, the government concedes that "Stephen Friedman was the formal owner of PoolRe in 2016." Gov't fact resp. at 113 (¶ 65). The government's second ground is a non-sequitur. It does not follow that because Capstone administered other captive-insurance arrangements, an expense of FinServ would adversely affect Capstone. The government's third ground does not apply the applicable legal test for risk transfer, which focuses on the effect of the payment of a claim by the insurance company on the insured's balance sheet and net worth.

### B. The government has not established a dispute of material fact regarding risk distribution under the Federal Circuit test.

In contending that Capstone has not established risk distribution, the government relies on *Caylor Land & Dev., Inc., v. Comm'r,* T.C. Memo. 2021-30 (T.C. 2021) to argue that risk distribution depends not on the number of sibling

insureds, but on a large enough pool of "independent risk exposures." Gov't resp. at 21–22. The government then implies that there is a geographic component to risk distribution as well as a minimum number of policies, insured property, and insured employees. Gov't resp. at 23. That may be true in the Tax Court, but again, the Federal Circuit did not adopt the Tax Court test. It adopted its own test, which involved "spreading the risk among policyholders." *Ocean Drilling,* 988 F.3d at 1153. *See also Kidde,* 40 Fed. Cl. at 56 ("[W]hen viewed from the perspective of that subsidiary, risk distribution also took place in that [the insurance company] distributed the risk faced by that subsidiary in a pool with the risks of other entities in which the subsidiary did not have an ownership interest.").

Here, FinServ distributed risk through (1) insuring its corporate siblings, (2) participating in the quota-sharing risk pool with 78 other insurance companies insuring a total of 275 insureds; and (3) participating in a contractual liability reinsurance program regarding vehicle-service contracts through PoolRe. But even without participating in the quota-sharing arrangement and the contractual liability reinsurance program, FinServ distributed risk. Just considering FinServ's business with Capstone and its corporate siblings, Capstone paid 25% ($147,595) of the premiums received by FinServ from Capstone and its siblings (totaling $590,381). Seventy-five percent of unrelated business is sufficient for risk to be distributed. *See Ocean Drilling,* 988 F.2d at 1153.

The government complains that Capstone's risk-distribution analysis is a "bare page-and-a-quarter" and merely arithmetic. Gov't resp. at 24. But the

government's insistence that the analysis must be complex is not borne out by the Federal Circuit's application of its test. The Federal Circuit's analysis of risk distribution was barely a paragraph and also merely arithmetic. *Ocean Drilling,* 988 F.2d at 1153 ("Mentor had unrelated business of approximately 44 and 66 percent for the two years at issue. This amount of unrelated business sufficiently spreads risk so as to constitute risk distribution."). The analysis of risk distribution by the Court of Federal Claims in *Kidde* likewise is succinct. It analyzed the presence of both risk transfer and risk distribution in one paragraph. 40 Fed. Cl. at 55–56 ("Similarly, when viewed from the perspective of that subsidiary, risk distribution also took place in that KIC distributed the risk faced by that subsidiary in a pool with the risks of other entities in which the subsidiary did not have an ownership interest."). While the government seeks to make the questions of risk shifting and risk distribution complex, they are not.

The government relies on *Reserve Mechanical Corp. v. Comm'r,* 34 F.4th 881 (10th Cir. 2022) in arguing that PoolRe did not distribute risk. That case is distinguishable because it did not apply the *Ocean Drilling* test nor did it consider *Moline*. It operates within the Tax Court framework, which is not adopted by the Federal Circuit. It also involved a challenge to the captive insurer, but there is no challenge to FinServ in the present case. In dismissing the quota-share arrangement entered into by Reserve Mechanical with PoolRe, the court summarily dismissed the quota contributions by the participants as not being actuarially determined. 34 F.4th at 906, 910–11. Of course, by definition, a quota-share

contribution will not be actuarially determined because contributions are determined by a fixed percentage (the quota share), not by actuarial pricing. *Cf. Colonial Penn. Ins. Co. v. Am. Centennial Ins. Co.,* 1997 U.S. Dist. LEXIS 133, at *3 n. 2 (S.D.N.Y 1997) (observing that quota-share reinsurance involves an agreement to indemnify the primary insurer for a fixed percentage of any losses in exchange for a corresponding percentage of the premiums); Black's Law Dictionary (6th ed. 1990) (defining *quota* as "a proportional part or share"). There is no legal basis for invalidating a quota-share arrangement because it relies on quota-share contributions. Further, the court stated that PoolRe was removed from any actual risk associated with the insureds. 34 F.4th at 906. But again, that is inherent in a quota-share arrangement managed by an intermediary. The intermediary does not assume risk but facilitates the distribution of that risk among the participants of the quota-share pool. Moreover, intrinsic to quota-share arrangements is that risk and premiums are transferred in and ceded out in the same proportionate amount. Because the Tenth Circuit did not apply the controlling test of the Federal Circuit, its decision is not persuasive authority. And in any event, this is a *de novo* proceeding.

The government suspects that there is a circular flow of funds among Capstone, FinServ, and PoolRe. Gov't resp. at 24–25. The government's suspicions are not the relevant standard under RCFC 56 and, in any event, this is just a variation of the government's economic-family argument ignoring the separate corporate existence of these entities and their respective contractual obligations.

Additionally, contrary to the government contention, Capstone introduced evidence that the Aria/PoolRe/FinServ contracts existed. *See* SOF (dkt. 187-1) at 22–23 (¶¶ 75–77) and evidence cited therein (such as the agreement, deposition testimony of Gary Fagg and Robert Snyder (PoolRe's 30(b)(6) witness), and other documentary evidence). The government's reference to Stewart Feldman's description of what he called "the Life of the South program" does not create a material dispute of fact regarding the Aria/PoolRe/FinServ contractual relationship. *See e.g.,* gov't fact resp. at 137–38 (¶ 76); Feldman dep. (gov't ex. 11 (dkt. 189-11)) at 160, ln. 10.

### C. The government has not established a dispute of material fact under *Moline.*

In its opening brief, Capstone identified several facts supporting the proposition that FinServ and PoolRe were not shams under *Moline.* As to FinServ, in addition to relying on the invalid economic-family argument, the government asserts that there are "additional uncertainties" regarding whether (1) Capstone actually paid the premiums, (2) whether FinServ engaged in traditional investment strategies, and (3) whether FinServ actually processed claims according to standardized processes. "Additional uncertainties" is not a legally relevant standard. The government must establish a genuine dispute of material fact based on a specific reference to the record. RCFC 56(c)(1)(A) ("A party asserting that a fact ... is genuinely disputed must support the assertion by (A) citing to particular parts of the materials in the record[.]"). Capstone observes that the government misquotes RFCF 56(c)(1)(A)—and thereby misstates—the applicable rule. Gov't resp. at 3.

Whether Capstone paid the premiums is not a question relevant to *Moline,* risk transfer, or risk distribution, but a fundamental requirement in and of itself for claiming the deduction. IRC § 162 ("paid or incurred"). The evidence before the Court establishes that Capstone paid its premiums through its agent under the shared-services agreement, Feldman Law Firm. SOF (dkt 187-1) at 48–49 (¶¶ 150, 154); gov't fact resp. at 330 (¶ 150), 344 (¶ 154). The government does not create a material issue of fact by ignoring Feldman Law Firm's receipt of Capstone's receivables, which are used to pay the insurance premiums. SOF, at 48 (¶ 152), gov't fact resp. at 335–338 (¶ 152). *See also* Capstone ex. 91 (dkt. 184-9) (Capstone 2016 form 1065) (reporting $9,360,191 in income for tax year 2016).

There is no requirement under IRC § 831(b) or *Ocean Drilling* that FinServ engage in whatever the government denominates as "traditional investment strategies." Merely loaning money from one corporate affiliate to another is not an illegitimate business transaction and is not evidence that corporate form should be ignored under *Moline.* Particularly, as here, where FinServ receives and reports as taxable the interest income from the affiliated note issuers, as can be seen on FinServ's general ledger. *See* SOF at 42 (¶131), FinServ's 2016 general ledger (Capstone ex. 87 (dkt. 184-8), at CAS-116099-A thru 100-A), and FinServ's 2016 tax return (Capstone ex. 94 (dkt. 184-9), at CAS-117516-A). Obviously, disguised dividends pretending to be loans is tax abuse. But that is not what the government alleges. Rather, the government essentially alleges that the mere existence of loans among affiliated companies is tax abuse and supports a finding that the companies

are shams. Gov't resp. at 32–34. Neither *Moline, Ocean Drilling,* nor IRC § 831(b) support this expansive proposition, which would put far more than IRC § 831(b) insurance companies at risk of being disregarded. Similarly, there is no requirement under *Moline, Ocean Drilling,* or IRC § 831(b) that FinServ have standardized claims processes, whatever that may mean. This is an attempt by the government to invalidate IRC § 831(b) insurance companies based on the proposition that they need to mimic commercial insurance carriers. And, in any event, FinServ paid claims in 2016, and Capstone reported the amount of those claims as income. SOF at 43–44, 46 (¶¶ 132–34, 143, and 145) (cited evidence includes FinServ's general ledger, bank statements and payment documents, and Capstone's general ledger and 2016 form 1065 (Capstone exhibits 84, 87–89 (dkt. 184-8), 91, and 92 (dkt. 184-9), and Paul Franks decl. (dkt. 180-1)). If the government believes that the losses were not actually incurred, then it can always disallow the loss deduction instead of invalidating the IRC § 831(b) insurance company.

The government's expert opinions do not preclude the granting of summary judgment. David L. Eckles's testimony is irrelevant because he states that he is testifying as an insurance economist looking at the insurance transaction from an economic perspective. Eckles decl., ¶¶ 5–12; *Kidde,* 40 Fed. Cl. at 55. Eckles relies on the economic-family argument in claiming that no risk transfer occurred. Eckles decl., ¶¶ 32–34. Serio's testimony is irrelevant because he states that he is analyzing whether the Capstone insurance "is, from a regulatory perspective, bona

fide insurance." Serio decl. (dkt 189-3), ¶ 7. Whether or not the insurance satisfies Serio's view of regulatory requirements is not relevant to the Federal Circuit's test for insurance. Zanjani's testimony is irrelevant. Zanjani, a finance and insurance professor, opines that FinServ did not achieve "meaningful risk distribution" and was charging overstated premiums. Zanjani decl. (dkt. 189-4), ¶¶ 5–6. But he does not apply the applicable test under *Ocean Drilling*. Zanjani decl., ¶¶ 13, 23, 40.

## VI. Observations regarding the government's response to Capstone's factual statement.

The government's factual response contains many repetitive boilerplate objections, which the Court should reject. "The Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development." *Amaretto Ranch Breedables v. Ozimals Inc.,* 907 F.Supp.2d 1080, 1081 (N.D. Cal. 2012). Boilerplate objections deserve no more than boilerplate responses. *See Oxford Asset Mgmt. v. Jaharis,* 297 F.3d 1182, 1197 (11th Cir. 2002). Objections that are repetitive, merely recite general evidentiary principles, and are devoid of specific analysis are generally rejected by courts. *See, e.g., Ayala v. Costco Wholesale Corp.,* 2020 U.S. Dist. LEXIS 178850, at *5–6 (C.D. Cal. 2020). The lack of any individualized analysis by the government is shown by its pervasive use of the term "to the extent."

As to the government's generic "self-serving" objection, that a declaration in support of a motion for summary judgment is self-serving is not grounds to disregard it. *Boykin v. Family Dollar Stores of Michigan, LLC,* 3 F.4th 832, 841 (6th Cir. 2021); *Hill v. Tangherlini,* 724 F.3d 965, 967 (7th Cir. 2013) ("As we have

repeatedly emphasized over the past decade, the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). The Federal Circuit's decision in *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565 (Fed. Cir. 1991) does not hold otherwise. In that case, the Federal Circuit found summary judgment inappropriate due to, among other reasons, apparent material inconsistencies in a witness's multiple affidavits. *Id.* at 1576–78. As to the government's apparent invocation of the best-evidence rule, Fed. R. Evid. 1002 does not prohibit a witness from testifying as to personal knowledge, even if documents could be submitted to prove the facts the witness is testifying to. *Rodriguez v. Señor Frog's De La Isla, Inc.,* 642 F.3d 28, 33–34 (1st Cir. 2011); *United States v. Fagan,* 821 F.2d 1002, 1009 n. 1 (5th Cir. 1987). *See also Travelers Ins. Co. v. United States,* 46 Fed. Cl. 458, 463 (Fed. Cl. 2000) (stating that Rule 1002 does not "prevent the introduction in evidence of facts about the document, or facts that exist independently of the document that are not given legal consequences by the terms of the document."). As to the government's repeated observation that whether the insurance arrangement is insurance is the ultimate issue of the case, Capstone observes that the Court must grant summary judgment to Capstone if there is no dispute of a material fact and Capstone is entitled to judgment as a matter of law. RCFC 56(a). The proper characterization of a transaction for tax purposes is a question of law. *Salem Fin., Inc. v. United States,* 786 F.3d 932, 940 (Fed. Cir. 2015). "[T]he requirement to draw favorable 'inferences' relates only to *factual*

inferences, not to legal conclusions based on an established set of facts, even though those facts do not all favor that conclusion." *Newell Cos. V. Kenney Mfg. Co.,* 864 F.2d 757, 767 (Fed. Cir. 1988) (emphasis in original).

The Court should ignore any arguments that are contained in the government's response to the statement of facts that are not contained or developed in the government's brief. *See Tripathy v. McCloskey,* 2024 U.S. Dist. LEXIS 89478, *5–6 (S.D.N.Y. 2024) (noting that a factual response under the court's local rules that includes argument is a manifest evasion of the page limits for briefing).

The government relies on *Reserve Mechanical* at several points in its response to the statement of facts. As explained above, *Reserve Mechanical* does not apply the applicable test and suffers from analytical flaws. Moreover, the government has not even contended that res judicata or collateral estoppel applies to *Reserve Mechanical*. And this proceeding is *de novo*.

The government at various points suggests that the common ownership of FinServ and Capstone is sufficient to find that no insurance relationship existed between FinServ and Capstone. *See, e.g.,* gov't fact resp. at 216 (¶ 108), 227 (¶ 113). But this is just the rejected economic-family argument.

Defendant at various points suggests that Capstone needs to establish a business case for purchasing insurance from an IRC § 831(b) insurance company. *See, e.g.,* gov't fact resp., at 84 (¶ 48), 88 (¶ 51). Whether Capstone had other options for risk management is not an element of the *Ocean Drilling* test. And no such requirement can be read into IRC § 831(b). *See Haynes,* 353 U.S. at 84.

Although the government concedes that PoolRe was owned by Friedman in 2016, and Capstone's evidence confirms this, the government states that the board minutes of PoolRe from 2010 adopting PoolRe's conflict-of-interest policy state that PoolRe is a subsidiary of Capstone. *See, e.g.,* gov't fact resp. at 113 (¶ 65), SOF at 20 (¶¶ 64–65). Even if Capstone owned PoolRe, that would not yield a different legal result. The operation of PoolRe's risk-pooling—by which the participating insurance companies pay the claims, not PoolRe—means that any payout under the pooling arrangement would not adversely affect Capstone's financial statements or net worth.

The government disputes Capstone's payment of $147,595 to FinServ and $92,178 to PoolRe based on Capstone's reporting of $356,386 in insurance premiums on its tax return. *See, e.g.,* gov't fact resp. at 361 (¶ 158). But this simply reflects that Capstone had other insurance in addition to FinServ and PoolRe. Franks decl., ¶ 43; SOF at 46–47, 50–53 (¶¶ 144, 156–66). The government also acknowledges that Feldman Law Firm was the custodian of Capstone's cash assets and that Feldman Law Firm received Capstone's cash receipts and paid Capstone's expenses under the plain language of the shared-services agreement. Gov't fact resp. at 330 (¶ 150), 344 (¶ 154). The government does not appear to contest that Feldman Law Firm received $9,209,736 in receipts for Capstone in 2016 under the shared-services agreement and that it had sufficient Capstone funds to pay the premiums. SOF at 48 (¶ 152), gov't fact resp. at 335–338 (¶ 152). *See also* Capstone ex. 91 (Capstone 2016 form 1065) (reporting $9,360,191 in income for tax year 2016).

## VII. Conclusion.

By enacting IRC § 831(b) with its tax benefits, Congress incentivized the creation of small insurance companies. A cap on total premiums of $1.2 million suggests that Congress was not intending for IRC § 831(b) insurance companies to mimic commercial insurance carriers. There is no suggestion in IRC § 831(b) that Congress intended IRC § 831(b) insurance companies to have actuarial departments, claims departments, sophisticated procedures, or any other markings of commercial insurance. Rather, IRC § 831(b) is an opportunity for small businesses to set aside funds for losses in a separate entity subject to special tax rules. As long as corporate formalities are followed, separate entities are respected, and risk is transferred and distributed, the parties to the transaction should be entitled to the tax benefits Congress allowed.

March 2, 2026

s/ Chad D. Nardiello -
CHAD D. NARDIELLO
Attorney of Record
Nardiello Turanchik Tompkins LLP
1801 Century Park East, Suite 1050
Century City, California 90067
(310) 201-0123 ext. 101
(310) 201-0126 (facsimile)
chad@nt-llp.com

BENJAMIN L. TOMPKINS
ANDREW T. PRIBE
Of Counsel

Nardiello Turanchik Tompkins LLP